USCA1 Opinion

 

 January 3, 1995 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT _________________________ Nos. 93-2374 94-1128 94-1129 JAY A. PRITZKER, Plaintiff, Appellee, v. BOB YARI, ET AL., Defendants, Appellants. _________________________ ERRATA SHEET ERRATA SHEET The opinion of the court issued on December 13, 1994, is corrected as follows: On page 38, line 11, change "Words of Days" to "Works and ______________ _________ Days". ____ UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT _________________________ Nos. 93-2374 94-1128 94-1129 JAY A. PRITZKER, Plaintiff, Appellee, v. BOB YARI, ET AL., Defendants, Appellants. _________________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Jaime Pieras, Jr., U.S. District Judge] ___________________ _________________________ Before Selya and Cyr, Circuit Judges, ______________ and Zobel,* District Judge. ______________ _________________________ Roger R. Crane, with whom Bachner, Tally, Polevoy & Misher, ______________ _________________________________ Roberto Boneta, Munoz Boneta Gonzalez Arbona Benitez & Peral, _______________ _______________________________________________ Jose Trias-Monge, and Trias & Melendez were on brief, for ________________ __________________ defendant Bob Yari. Martin I. Kaminsky, with whom W. Hans Kobelt and Pollack & __________________ ______________ _________ Kaminsky were on brief, for defendant Baird, Patrick & Co. ________ Benjamin Rodriguez-Ramon, Rodriguez-Ramon & Rodriguez- __________________________ _______________________________ Hernandez, and Emigdio R. Seles on brief for defendant Lincoln _________ ________________ Realty, Inc. Ruben T. Nigaglioni, with whom Diana Mendez-Ondina and _____________________ ____________________ Ledesma, Palcu & Miranda were on brief, for defendant Paul S. _________________________ Dopp. Gael Mahony, with whom Frances S. Cohen, David A. Hoffman, ____________ _________________ ________________ Joshua M. Davis, Hill & Barlow, Salvador Antonetti-Zequeira, ________________ ______________ ____________________________ Ricardo Ortiz-Colon, and Fiddler, Gonzalez & Rodriguez were on ___________________ ______________________________ brief, for plaintiff Jay A. Pritzker. _________________________ December 13, 1994 _________________________ _______________ *Of the District of Massachusetts, sitting by designation. SELYA, Circuit Judge. In this troika of appeals, we SELYA, Circuit Judge. _____________ address several questions arising collaterally from a bitterly fought breach-of-contract suit between Paul S. Dopp and Jay A. Pritzker (the D/P Litigation) concerning the ownership of two hotels, situated on approximately 1,000 beachfront acres, in the Commonwealth of Puerto Rico. The engine of high-stakes litigation runs on money, and at various times during the course of the D/P Litigation Dopp forged financing agreements with three different financiers, namely, Bob Yari, Lincoln Realty, Inc. (Lincoln), and Baird, Patrick & Co. (BPC), for the apparent purpose of fueling his prosecution of the suit. Although we first must address BPC's jurisdictional challenge, our principal task today is to resolve the contested legal status of these financing agreements. Having carefully examined the relevant law and the facts of the case, we hold that all three financing agreements involve "litigated credits" within the meaning of article 1425 of the Civil Code of Puerto Rico, P.R. Laws Ann. tit. 31, 3950 (1991); that all are, therefore, subject to redemption by Pritzker under Puerto Rico law; and that Pritzker properly perfected his rights to redemption. We also hold that the lower court's trimming of Pritzker's right to redeem Yari's litigated credit lacked any legal basis. Consequently, we affirm in part and reverse in part. I. BACKGROUND I. BACKGROUND The facts relating to the underlying breach of contract and the protracted litigation emanating from it are chronicled in 3 a series of opinions, see Dopp v. Pritzker, ___ F.3d ___, ___ ___ ____ ________ (1st Cir. 1994) [Nos. 93-2373, 94-1130, & 94-1131, slip op. at 3- 6]; (Dopp IV); Dopp v. HTP Corp., 947 F.2d 506, 508-09 (1st Cir. _______ ____ __________ 1991) (Dopp II); Dopp v. HTP Corp., 831 F. Supp. 939, 941-92 _______ ____ _________ (D.P.R. 1993) (Dopp III); Dopp v. HTP Corp., 755 F. Supp. 491, ________ ____ _________ 492-94 (D.P.R. 1991) (Dopp I), and need not be rehearsed. Hence, ______ we confine our account to the facts that are needed to place the instant appeals into workable perspective.1 A. The Financing Agreements. A. The Financing Agreements. ________________________ In March 1990, a jury sitting in the United States District Court for the District of Puerto Rico found Pritzker liable to Dopp in the sum of $2,000,000 for breach of an oral contract concerning the purchase of the Dorado Beach Hotel Corporation (DBHC). The district court entered judgment in the D/P Litigation, see Dopp I, 755 F. Supp. at 504, and a firestorm ___ ______ of appeals ensued. We eventually upheld the liability finding but vacated the damage award and ordered a new trial limited to questions of remediation. See Dopp II, 947 F.2d at 520. ___ _______ As these events were unfolding, Dopp launched a collateral enterprise, assigning various portions of the anticipated proceeds of the D/P Litigation to third parties. He  ____________________ 1For purposes of oral argument, we consolidated the financiers' appeals with three other appeals two taken by Pritzker and one by Dopp involving the remedial phase of the main litigation. We resolved most of the points raised in Pritzker's and Dopp's appeals by means of a separate opinion issued on October 28, 1994. See Dopp IV, supra. In this ___ ________ _____ opinion, we deal with not only the financiers' appeals but also the complaints voiced by Pritzker and Dopp concerning the district court's rulings anent the financing agreements. 4 undertook this effort, in his words, "to meet some of the litigation and personal expenses . . . incurred during the years of this intense litigation and in connection therewith." All told, Dopp entered into three separate nonuniform financing agreements with three distinct financiers. Dopp signed the first financing agreement, styled as a "Judgment or Settlement Purchase Agreement," on June 26, 1990. In this transaction, Lincoln agreed to provide $50,000 in exchange for an 8% interest in the proceeds of the D/P Litigation above a stipulated floor. The agreement obliged Dopp to apprise Lincoln of developments in the litigation on a current basis. Dopp entered into the second financing agreement on October 16, 1991. In it, BPC agreed to provide $100,000 in exchange for a 5% interest in the proceeds of the D/P Litigation over a floor different from that negotiated between Dopp and Lincoln. Moreover, the BPC agreement mandated certain minimum repayments to the financier. These minima varied depending upon the date on which, in the words of the contracting parties, the D/P Litigation might eventually be "settled or otherwise decided." Like the Lincoln agreement, the BPC agreement obliged Dopp to keep the financier seasonably informed of litigatory developments. Dopp entered into the third and last financing agreement on July 23, 1992. In consideration of $250,000 in cash and a promise to obtain, or at least to assist in obtaining, a $2,500,000 to $3,000,000 line of credit for one year, Dopp agreed 5 to allocate the remainder of the proceeds of the D/P Litigation according to a preset formula: "(i) first, to repayment of all indebtedness in relation to the line of credit to have been obtained in Dopp's name; (ii) second, $2,500,000 to Yari; (iii) third, $12,000,000 to Dopp; (iv) fourth, $7,000,000 to Yari; and (v) fifth, the remaining amount, if any, to be divided equally between Dopp and Yari." Dopp III, 831 F. Supp. at 954.2 The ________ Yari agreement also set in place virtual joint control of the litigation. Although Yari ultimately provided less funding (somewhere between $500,000 and $625,000) than Dopp claims was due, the district court found that Yari "complied with all of his obligations under his agreements . . . ." Id. at 956. ___ B. Pertinent Proceedings Below. B. Pertinent Proceedings Below. ___________________________ On October 9, 1992, Dopp disclosed the existence of the financing agreements in the midst of a new discovery round. Exactly one week later, Pritzker wrote to Lincoln, offering to tender the amount paid to Dopp in exchange for Lincoln's rights and beneficial interests under its financing agreement. On the same date, Pritzker sent substantially identical missives to BPC andYari,3and notifiedthe districtcourtof hisletter-writing spree.  ____________________ 2On September 24, 1992, Dopp and Yari entered into a written modification of their agreement. The amendment is only peripherally related to the issues we must decide today. To the extent it is relevant, we discuss it in Part III(D), infra. _____ 3Pritzker made the three tenders pursuant to article 1425 of the Civil Code of Puerto Rico, which provides in its entirety: When a litigated credit is sold, the debtor shall have the right to extinguish the same by reimbursing the assignee for the 6 When his communiques drew no meaningful response, Pritzker promptly filed a complaint in the district court. He named Dopp and the three financiers as defendants, along with an ostensible partnership between Dopp and Yari. Pritzker averred that each of the financing agreements involved the sale of a litigated credit within the meaning of article 1425 and, hence, was subject to extinguishment. Between December 18, 1992, and June 1, 1993, Pritzker, through a series of motions, deposited with the district court the funds that he believed were necessary to redeem the financiers' interests in the proceeds of the D/P Litigation. BPC moved to dismiss Pritzker's complaint against it for want of in personam jurisdiction, but the district court __ ________ demurred.4 After all defendants had answered the complaint, the  ____________________ price the later [sic] paid for it, the judicial costs incurred by him, and the interest on the price from the day on which the same was paid. A credit shall be considered as litigated from the day the suit relating to the same has been answered. The debtor may make use of his right within nine (9) days, counted from the day the assignee should demand payment of him. P.R. Laws Ann. tit. 31, 3950 (1991). 4BPC's motion stressed that it is a New York corporation transacting no routine business in Puerto Rico; that it has never had an office or agent in Puerto Rico; that Dopp and BPC signed the financing agreement in New York; that Dopp is a citizen and resident of New Jersey; and that Pritzker is a citizen and resident of Illinois. The district court found these facts, by and large, to be accurately stated. See Pritzker v. Yari, Civ. ___ ________ ____ No. 92-2825, 1993 WL 71760, at *3, slip op. at 6 (D.P.R. Mar. 5, 7 court consolidated Pritzker's suit with Dopp's suit against Pritzker. See id. at 942-43. In an opinion dated March 5, 1993, ___ ___ the court held that all three financing agreements involved litigated credits within the reach of article 1425, and that Pritzker was entitled, pursuant to that statute, to extinguish such credits through full reimbursement of the amounts advanced (together with interest and costs). See Pritzker v. Yari, Civ. ___ ________ ____ No. 92-2825, 1993 WL 71760, at *5-7, slip op. at 11-17 (D.P.R. Mar. 5, 1993). In a later, end-of-case opinion, the court reaffirmed this holding, see Dopp III, 831 F. Supp. at 952, ___ ________ carved out a partial exception applicable to Yari, see id. at ___ ___ 957-58, and determined the monetary amounts each party stood to lose or gain, see id. at 958-59. ___ ___ Following the entry of final judgment, the three financiers filed notices of appeal. Lincoln and Yari contested the application of article 1425 to their agreements. BPC piggybacked on this argument, but focused its appeal mainly on jurisdictional questions. Dopp joined the chorus, but, as he contributed no arguments that were both novel and substantial, we subsume his views in our ensuing discussion of the financiers' points on appeal. Pritzker cross-appealed, excoriating the district court's determination that he could redeem only one-half of Yari's litigated credit.  ____________________ 1993). The court added, however, "that the agreement [BPC] entered into with Dopp involved the purchasing of an interest in a case being tried in the District of Puerto Rico and that BPC has manifested a continuing interest in the conduct of the litigation." Id. ___ 8 II. PERSONAL JURISDICTION II. PERSONAL JURISDICTION Before proceeding to the main event, we must first jump through a jurisdictional hoop and determine whether the district court properly exercised in personam jurisdiction over BPC. The __ ________ hoop does not present an impenetrable obstacle. A. Charting a Course. A. Charting a Course. _________________ In its simplest formulation, in personam jurisdiction __ ________ relates to the power of a court over a defendant. It is of two varieties, general and specific. General personal jurisdiction, as its name implies, is broad in its ambit: it is the power of a forum-based court, whether state or federal, over a defendant "which may be asserted in connection with suits not directly founded on [that defendant's] forum-based conduct . . . ." Donatelli v. National Hockey League, 893 F.2d 459, 462-63 (1st _________ _______________________ Cir. 1990). Put another way, "[g]eneral jurisdiction exists when the litigation is not directly founded on the defendant's forum- based contacts, but the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state." United Elec. Workers v. 163 Pleasant St. Corp., _____________________ _______________________ 960 F.2d 1080, 1088 (1st Cir. 1992) (Pleasant St. I). Specific ______________ personal jurisdiction, by contrast, is narrower in scope and may only be relied upon "where the cause of action arises directly out of, or relates to, the defendant's forum-based contacts." Id. at 1088-89. ___ Nothing in the record before us suggests that BPC engaged within Puerto Rico in continuous and systematic activity. 9 Since it is the plaintiff's burden to establish facts sufficient to sustain general in personam jurisdiction, see Ticketmaster-New __ ________ ___ ________________ York, Inc. v. Alioto, 26 F.3d 201, 207 n.9 (1st Cir. 1994); __________ ______ Dalmau Rodriguez v. Hughes Aircraft Co., 781 F.2d 9, 10 (1st Cir. ________________ ___________________ 1986), and since Pritzker failed to carry that burden here, we may assume that general jurisdiction is lacking. Our analysis, therefore, focuses exclusively on specific jurisdiction. The proper exercise of specific in personam __ ________ jurisdiction hinges on satisfaction of two requirements: first, that the forum in which the federal district court sits has a long-arm statute that purports to grant jurisdiction over the defendant; and second, that the exercise of jurisdiction pursuant to that statute comports with the strictures of the Constitution. See Ticketmaster, 26 F.3d at 204; Pleasant St. I, 960 F.2d at ___ ____________ _______________ 1086; Hahn v. Vermont Law Sch., 698 F.2d 48, 51 (1st Cir. 1983). ____ ________________ We analyze these requirements separately, mindful that, in the circumstances of this case, the second prong of the inquiry necessitates an examination into the sufficiency of the relationship between BPC's contract to finance Dopp's Puerto Rico-based litigation and the exercise of jurisdiction over BPC by the Puerto Rico-based federal district court. B. The Long-Arm Statute. B. The Long-Arm Statute. ____________________ The requirement that the forum have a long-arm law of appropriate reach is easily satisfied here. A Puerto Rico statute provides in pertinent part that a Puerto Rico-based court may take jurisdiction over a person not domiciled in Puerto Rico 10 "if the action or claim arises because said person . . . transacted business in Puerto Rico personally or through an agent . . . ." P.R. Laws Ann. tit. 32, app. III, R.4.7(a)(1) (1984 & Supp. 1989). We have concluded before, and today reaffirm, that this statute extends personal jurisdiction as far as the Federal Constitution permits. See Dalmau Rodriguez, 781 F.2d at 12 ___ ________________ (citing A.H. Thomas Co. v. Superior Court, 98 P.R.R. 864, 870 n.5 _______________ ______________ (1970)); Mangual v. General Battery Corp., 710 F.2d 15, 19 (1st _______ ______________________ Cir. 1983). C. Due Process. C. Due Process. ___________ The second requirement that the exercise of jurisdiction fall within constitutional bounds presents a more intricate puzzle. Whether or not BPC "transacted business" within the meaning of the long-arm statute depends on whether the requisite minimum contacts can be attributed to it. By its very nature, the inquiry into minimum contacts is far from exact: "the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative." International Shoe Co. v. State of Washington, _______________________ ____________________ 326 U.S. 310, 319 (1945). The inquiry into minimum contacts is also highly idiosyncratic, involving an individualized assessment and factual analysis of the precise mix of contacts that characterize each case. See Pleasant St. I, 960 F.2d at 1088; ___ ______________ Hahn, 698 F.2d at 51. ____ To sharpen the logic of the personal jurisdiction 11 inquiry, we have developed a tripartite analysis: First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's court foreseeable. Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable. Pleasant St. I, 960 F.2d at 1089; see also Ticketmaster, 26 F.3d ______________ ___ ____ ____________ at 206; Pizarro v. Hoteles Concorde Int'l, C.A., 907 F.2d 1256, _______ ____________________________ 1258 (1st Cir. 1990). A careful application of these three elements to the facts at hand demonstrates that the exercise of in personam jurisdiction over BPC, for the specific purpose of __ ________ determining the legal status of its agreement with Dopp, does not offend constitutional principles. 1. Relatedness. The element of relatedness is not 1. Relatedness. ___________ difficult to satisfy here. For one thing, the relatedness test is, relatively speaking, a flexible, relaxed standard. See ___ Ticketmaster, 26 F.3d at 207. For another thing, it is self- ____________ evident that the dispute between Pritzker and BPC over the legal status of BPC's contract with Dopp would not have arisen but for that contract. Because the very document that represents BPC's forum-related activity is itself the cause and object of the lawsuit, this activity comprises the source and substance of, and is thus related to, Pritzker's squabble with BPC. See Pleasant ___ ________ St. I, 960 F.2d at 1089. _____ 2. Purposeful Availment. We must next determine 2. Purposeful Availment. ____________________ 12 whether BPC's Puerto Rico-based contacts "represent a purposeful availment of the privilege of conducting activities in [Puerto Rico], thereby invoking the benefits and protections of [its] laws and making the defendant's involuntary presence before [the Puerto Rico-based] court foreseeable." Id. ___ The path of inquiry is neither long nor winding. It necessarily begins with McGee v. International Life Ins. Co., 355 _____ ___________________________ U.S. 220 (1957). There, the Court ruled that a California court could properly exercise jurisdiction over an out-of-state insurer in a suit brought by a beneficiary of a policy written by the insurer at the behest of a California resident, even though the insurer had no office or agent in California and had never performed any other business in that state. The McGee Court _____ articulated a principle of marked importance for our purposes: in order to be subject to the jurisdiction of the forum state, a nonresident need have only one contact with the forum, so long as the contact is meaningful. See id. at 223 ("It is sufficient ___ ___ for purposes of due process that the suit was based on a contract which had substantial connection with that State."). Accordingly, McGee stands for the proposition that "minimum _____ contacts" is not necessarily a numbers game; a single contract can fill the bill. For our purposes, McGee remains good law.5 In Burger _____ ______  ____________________ 5The court below expressed some hesitation about relying on McGee, fearing that "the broad view of personal jurisdiction _____ articulated in McGee was curtailed in the next major Supreme _____ Court case dealing with the issue, Hanson v. Denckla, 357 U.S. ______ _______ 235 (1958)." Pritzker v. Yari, supra, at *4, slip op. at 9. ________ ____ _____ 13 King Corp. v. Rudzewicz, 471 U.S. 462 (1984), the Court, citing __________ _________ McGee, affirmed the principle that "even a single act can support _____ jurisdiction." Id. at 475 n.18. In that case, the Justices held ___ that a court sitting in Florida properly could exercise jurisdiction over a Michigan resident in a suit brought by a Florida corporation for breach of a franchise agreement, even though the defendant's only relationship to the forum state was of a contractual nature. Explaining that "[j]urisdiction in these circumstances may not be avoided merely because the defendant did not physically enter the forum State," id. at 476, ___ the Supreme Court observed that "where individuals `purposefully derive benefit' from their interstate activities, it may well be unfair to allow them to escape having to account in other States for consequences that arise proximately from such activities; the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed." Id. at 474-75 (quoting Kulko v. California Superior ___ _____ ___________________ Court, 436 U.S. 84, 96 (1978)). _____ These opinions demonstrate that the jurisprudence of  ____________________ This observation is true but beside any relevant point. The Hanson Court placed its principal emphasis on the requirement ______ that there be a purposeful act by the defendant, and that this ________________ requirement may not be satisfied merely by the unilateral act of another. See Hanson, 357 U.S. at 253-54. The Court ___ ______ distinguished McGee on this basis, and on the ground that Hanson, _____ ______ unlike McGee, "involve[d] the validity of an agreement that was _____ entered without any connection with the forum State." Id. at ___ 252. In the instant case, neither of these problems looms. BPC's decision to enter into the financing agreement was clearly its own, and that agreement, which entitled it to share the proceeds of Puerto Rico-based litigation, bears close ties to the forum. 14 minimum contacts casts a wide net, and a nonresident defendant may not always be able to elude the net by such simple expedients as remaining physically outside the forum or limiting contact with the forum to a single commercial transaction. Rather, courts must look beyond these formalistic measures and evaluate the nature of the contacts and, relatedly, the degree to which they represent a purposeful availment of the forum's protections and benefits. In the instant case, we conclude that BPC, by knowingly acquiring an economically beneficial interest in the outcome of a Puerto Rico-based lawsuit that involved control over property located in Puerto Rico, necessarily exhibited sufficient minimum contacts to subject it to the district court's exercise of specific in personam jurisdiction. Two considerations in __ ________ particular lead us to this conclusion. First, the subject matter of BPC's contact or relationship with Puerto Rico the consummation of the financing agreement is such that it can only be characterized as an act of purposeful availment. We think it is doubly significant that the financing agreement directly concerned forum-based litigation, and, in turn, that the litigation directly concerned forum-based real estate. Other than physical presence, we can imagine few contacts that are more integral to a forum than acquiring a financial stake in forum-based litigation concerning 15 forum-based property.6 The significance that Puerto Rico attaches to such an interest is reflected elsewhere in its long- arm statute, in which land ownership is deemed an independently sufficient basis for exercising personal jurisdiction. See P.R. ___ Laws Ann. tit. 32, app. III, R.4.7(a)(5) (extending jurisdiction of Puerto Rico courts over a person who "[o]wns, uses or possesses, personally or through his agent, real property in Puerto Rico"). Second, the specific nature of a contact is also important in discerning the elements of purposeful availment and foreseeability. BPC entered into its financing agreement precisely because it stood to benefit commercially from the eventual outcome of the Puerto Rico-based D/P Litigation. Furthermore, given the location of DBHC's assets and the nature of the remedies potentially available to Dopp, see Dopp II, 947 ___ ________ F.2d at 519 (listing alternative remedies), both the extent of BPC's profits and the value of its agreement were closely tied to the integrity and stability of Puerto Rico's economy. This means that the practical importance of BPC's relationship with Puerto Rico was far greater than the importance that could be attached to the random, fortuitous, or attenuated relationships about which the Court has previously voiced concern. See, e.g., Burger ___ ____ ______ King, 471 U.S. at 475; Keeton v. Hustler Magazine, Inc., 465 U.S. ____ ______ ______________________  ____________________ 6Indeed, had Dopp succeeded in obtaining resolution (his preferred remedy in the D/P Litigation, see Dopp IV, ___ F.3d at ___ ________ ___ [slip op. at 7-17]), he might have wound up with the hotels and the land, and, if so, BPC would presumably have been the equitable owner of a measurable interest in those properties. 16 770, 774 (1984); World-Wide Volkswagen Corp. v. Woodson, 444 U.S. ___________________________ _______ 286, 299 (1980). Consequently, we believe that BPC's venture represented nothing less than a purposeful availment of the privilege of conducting activities in Puerto Rico.7 BPC disagrees with this conclusion. It argues that the singularity of its contact renders the financing agreement quantitatively insufficient as a predicate for the exercise of jurisdiction. This argument fails for two reasons. In the first place, we do not view BPC's financing agreement as merely a one-time rendezvous with the forum. BPC cannot retract the fact that it backed Dopp's forum-based suit, so that its pact can hardly be cracked up to be an act that lacked incessant impact, but, rather, smacked of the exact sort of contact through which jurisdiction, if attacked, might be tracked and should remain intact. A contract conferring an interest in ongoing litigation that touches upon the legal status  ____________________ 7Although we have been unable to find any judicial decision squarely on point, we are reinforced in our conclusion by the results reached in analogous cases. See, e.g., Grimes v. ___ ____ ______ Vitalink Communications Corp., 17 F.3d 1553, 1559-60 (3d Cir.) ______________________________ (finding specific personal jurisdiction over a nonresident who owned stock in a forum-based corporation and who tendered it in accordance with a tender offer, on the ground that the defendant purposefully availed himself of the privilege of having a forum- based court determine his rights and thus invoked the benefits and protections of the forum), cert. denied, 115 S. Ct. ___ _____ ______ (1994); Manley v. Fong, 734 F.2d 1415, 1419-20 (10th Cir. 1984) ______ ____ (finding personal jurisdiction over a nonresident in regard to litigation arising out of a contract between the nonresident and a resident, executed out-of-state, for the purchase of an interest in a forum-state oil-and-gas lease); Quasha v. Shale ______ _____ Dev. Corp., 667 F.2d 483, 486-89 (5th Cir. 1982) (finding ___________ personal jurisdiction over nonresidents in a suit concerning the existence, enforceability, and performance of a contract to purchase mineral interests located in the forum state). 17 of real property situated in the forum establishes, by its very nature, a significant relationship with the forum and its legal system. Thus, it is easy to see how such a contact can become a hook on which in personam jurisdiction can be hung. See Burger __ ________ ___ ______ King, 471 U.S. at 475 n.18 (noting that "[s]o long as it creates ____ a `substantial connection' with the forum, even a single act can support jurisdiction," and distinguishing this from an "isolated" act in respect to which "the reasonable foreseeability of litigation in the forum is substantially diminished") (quoting McGee, 355 U.S. at 223). _____ In the second place, BPC's emphasis on the quantitative ____________ aspects of its contact ignores both the contact's qualitative ___________ aspects and the role of substance, as opposed to mere frequency, in the minimum contacts calculus. So one-sided a view distorts reality. See International Shoe, 326 U.S. at 318 (assessing a ___ __________________ defendant's acts by "their nature and quality and the circumstances of their commission"). BPC also contends that the exercise of jurisdiction here would be inconsistent with circuit precedent. In this vein, BPC directs our attention to Pizarro, a case in which we held _______ that a corporation's placement of nine advertisements in a Puerto Rico newspaper did not create in personam jurisdiction for __ ________ purposes of a tort suit brought by a person who responded to an advertisement, took a trip to the advertised resort, and 18 sustained personal injuries outside of Puerto Rico.8 See ___ Pizarro, 907 F.2d at 1260. _______ We do not think that Pizzaro is in any way antithetical _______ to the result we reach today. We decided Pizarro based on a lack _______ of relatedness, specifically finding that the advertisements had "no connection with the negligent act . . . that allegedly caused the injury," and that, therefore, it could not "be said that the negligent act `arose out of' [the defendant's] placing of the advertisements . . . ." Id. at 1259. Since relatedness is ___ beyond question in the present case, see supra Part II(C)(1), ___ _____ Pizarro is not on point and BPC's reliance on it is mislaid. _______ 3. The Gestalt Factors. Having determined that BPC's 3. The Gestalt Factors. ___________________ financing agreement falls within the ambit of sufficient minimum contacts, we proceed to the third and final element of our analysis and inquire whether the exercise of jurisdiction over BPC in the circumstances of this case would, holistically viewed, offend traditional notions of "fair play and substantial justice." Burger King, 471 U.S. at 476 (quoting International ___________ _____________ Shoe, 326 U.S. at 320). ____ Admittedly, "fair play" and "substantial justice" are not the most self-defining of legal formulations. For that reason, we have added the flesh of a five-factor gestalt analysis to these skeletal due process concepts. The factors include:  ____________________ 8Pizarro typifies a line of cases to like effect. See, _______ ___ e.g., Fournier v. Best W. Treasure Island Resort, 962 F.2d 126 ____ ________ _______________________________ (1st Cir. 1992); Marino v. Hyatt Corp., 793 F.2d 427 (1st Cir. ______ ___________ 1986). 19 (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies. Pleasant St. I, 960 F.2d at 1088. These gestalt factors are _______________ designed to put into sharper perspective the reasonableness and fundamental fairness of exercising jurisdiction in particular situations. See Ticketmaster, 26 F.3d at 210. They "are not ___ ____________ ends in themselves, but they are, collectively, a means of assisting courts in achieving substantial justice. In very close cases, they may tip the constitutional balance." Id. at 209. ___ When applied to the case sub judice, the gestalt factors point ___ ______ unerringly toward the exercise, and away from the declination, of jurisdiction over BPC. As to the first factor, we may fairly assume that the defendant's appearance in Puerto Rico is to some extent burdensome. But the concept of burden is inherently relative, and, insofar as staging a defense in a foreign jurisdiction is almost always inconvenient and/or costly, we think this factor is only meaningful where a party can demonstrate some kind of special or unusual burden. See, e.g., id. at 210 (noting that ___ ____ ___ "most of the cases that have been dismissed on grounds of unreasonableness [of the burden of appearing] are cases in which the defendant's center of gravity, be it place of residence or place of business, was located at an appreciable distance from 20 the forum"); see also Burger King, 471 U.S. at 474 (explaining ___ ____ ____________ that "it usually will not be unfair to subject [a nonresident defendant] to the burdens of litigating in another forum for disputes relating to [in-forum economic] activity"). In the modern era, the need to travel between New York and Puerto Rico creates no especially ponderous burden for business travelers. Thus, BPC has not adequately demonstrated that an exercise of jurisdiction in the present circumstances is onerous in a special, unusual, or other constitutionally significant way. The second factor the interest of Puerto Rico in having a Puerto Rico-based court adjudicate the dispute weighs heavily in favor of an exercise of jurisdiction. Sovereigns have few interests greater than those in the conduct of forum-based litigation and the disposition of forum-based real estate. Here, these interests are not only present; they constitute the essence of the suit which the nonresident defendant, BPC, seeks to avoid.9 The third factor is the plaintiff's interest in obtaining convenient and effective relief. This consideration likewise cuts in favor of jurisdiction. Not only must we "accord plaintiff's choice of forum a degree of deference in respect to the issue of its own convenience," Ticketmaster, 26 F.3d at 211, ____________ but also we must take note of the enormous inconvenience that  ____________________ 9At the expense of carting coal to Newcastle, we think that the Commonwealth also possesses an atypically strong interest in having Puerto Rico-based courts hear and resolve controversies involving its litigated credit statute. 21 might result from forcing Pritzker to sue elsewhere theoretically, in every jurisdiction in which a financier is located despite ongoing litigation in a forum-based court. The fourth factor the judicial system's interest in obtaining the most efficacious resolution of the controversy similarly counsels against furcation of the dispute among several different jurisdictions. Such a result would both contravene the goal of judicial economy and conjure up the chimera of inconsistent outcomes. The fifth and last of the gestalt factors implicates the interests of the affected governments in substantive social policies. Here, the most salient such policy is that embodied in article 1425 itself: the discouragement of speculation in litigation. All sovereigns share both a general interest in preventing such speculation and a specific interest in respecting Puerto Rico's decision to control this activity through regulation. For obvious reasons, a failure to find jurisdiction in this case would necessarily subvert these interests. D. Recapitulation. D. Recapitulation. ______________ In sum, by deliberately contracting for a portion of the proceeds of litigation, the subject of which concerned Puerto Rico property and the situs of which was a Puerto Rico-based court, BPC deliberately sought to procure the commercial advantages of transacting business in Puerto Rico. Having called the tune, it now must pay the piper. Hence, we conclude that the instant litigation arises out of, and thus directly relates to, 22 the financing agreement that BPC consummated with Dopp. Because that agreement has a distinctive relationship to Puerto Rico as we have said, its subject matter and specific nature betoken that BPC purposefully availed itself of the benefits and protections of Puerto Rico and its legal apparatus and because BPC's subsequent (involuntary) presence before the district court was entirely foreseeable, bringing BPC before the bar of a Puerto Rico-based court in respect to litigation arising out of the financing agreement is neither unreasonable nor fundamentally unfair. It follows, therefore, as night follows day, that Puerto Rico's long-arm statute reaches this dispute, and the lower court's exercise of in personam jurisdiction over BPC is both __ ________ legally and constitutionally supportable. III. THE FINANCING AGREEMENTS III. THE FINANCING AGREEMENTS We turn now to the main event a series of questions involving the enforceability and interpretation of the financing agreements. In answering these questions, we look to the law of Puerto Rico for the rule of decision.10 See Erie R.R. Co. v. ___ ______________  ____________________ 10BPC and Yari halfheartedly attempt to challenge the district court's choice of Puerto Rico law to govern their respective contracts with Dopp. Neither entry makes it to the starting gate. Yari merely proposes how his contract with Dopp might be construed under California law, without pausing to explain why California law is relevant. Our corpus of cases, cumulatively considered, clearly commands that contentions which are not carefully composed and candidly constructed customarily careen beyond the cognizance of this court. See, e.g., Ryan v. ___ ____ ____ Royal Ins. Co., 916 F.2d 731, 734 (1st Cir. 1990) ("It is settled ______________ in this circuit that issues adverted to on appeal in a perfunctory manner, unaccompanied by some developed argumentation, are deemed to have been abandoned."). BPC's claim fails for several reasons, the first of which is that the record contains no indication that BPC developed it below. "It is a 23 Tompkins, 304 U.S. 64, 78 (1938). ________ Article 1425 of the Civil Code confers on a defendant a right to redeem a "litigated credit" or "litigious credit," that is, the interest of a third party who has purchased a stake in the outcome of civil litigation. Evaluating this statute is a daunting task, made all the more complicated in this case as the parties have raised a myriad of issues ranging from the legal status of the financing agreements to the propriety of Pritzker's efforts to prime the article 1425 pump. We address these issues sequentially, for the most part subjecting the district court's determinations to plenary review. See United States v. Gifford, ___ _____________ _______ 17 F.3d 462, 472 (1st Cir. 1994) (holding that questions of statutory interpretation are purely legal in nature, and, thus, engender de novo review); Liberty Mut. Ins. Co. v. Commercial __ ____ ______________________ __________ Union Ins. Co., 978 F.2d 750, 757 (1st Cir. 1992) (same); see _______________ ___ also Salve Regina Coll. v. Russell, 499 U.S. 225, 239-40 (1991) ____ __________________ _______ (holding that "courts of appeals [must] review the state-law determinations of district courts de novo"). __ ____ A. Article 1425. A. Article 1425. ____________ We begin our expedition by clarifying certain matters relating to article 1425 (the text of which is reproduced in its entirety in note 3, supra). The undue hullabaloo in this case _____ stems from the fact that article 1425 is a very unusual animal.  ____________________ bedrock rule that when a party has not presented an argument to the district court, he may not unveil it in the court of appeals." United States v. Slade, 980 F.2d 27, 30 (1st Cir. ______________ _____ 1992). 24 Several aspects of the statute deserve emphasis or elaboration. First, the purpose of article 1425, as recently restated by the Puerto Rico Supreme Court, is to prevent "`the illegal trade of litigious credits which were purchased for a price below their actual value, and then the actual price was recovered from the debtor and big profits reaped.'" Consejo de __________ Titulares v. Urban Renewal & Hous. Corp., 93 J.T.S. 25 (1993) _________ _____________________________ (Official English Translation: No. RE-87-297, slip op. at 14) (quoting 3 D. Espin Canovas, Manual de Derecho Civil Espanol 240 _______________________________ (1983)); Mervin H. Riseman, The Sale of a Litigious Right, 13 _______________________________ Tul. L. Rev. 448, 448 (1939) ("A desire to put an end to litigation and to prevent speculation in lawsuits has resulted in the disapproval by the civil law of the sale of litigious rights."). To this extent, then, the district court hit the bull's-eye when it declared that the "single, serious purpose" of article 1425 is "to discourage financial speculation in litigation." Pritzker v. Yari, supra, at *5, slip op. at 11-12. ________ ____ _____ Second, the Puerto Rico Supreme Court has recognized, in fidelity to the statutory text, that "[a] credit is deemed litigious from the moment the lawsuit claiming the same is answered." Consejo de Titulares, supra, slip op. at 13. The _____________________ _____ court added: [A] credit is regarded as litigious when, upon being litigated, a final judgment is required to ascertain its existence, "that is, it is one which is in doubt and one in which the rights are uncertain. For a credit to be considered litigious it is essential that the litigation pending at the time of sale or assignment of credit concern the 25 existence of the credit itself and not merely the consequences of its existence once final judgment is rendered." Id. at 13-14 (quoting Martinez v. District Court, 72 P.R.R. 197, ___ ________ ______________ 199 (1951)). Here, there is no doubt that the financing agreements involve interests that fall within the contemplated chronological span. Third, article 1425 identifies the parties in interest in terms that are somewhat different than those used in conventional litigation. We consider the "debtor" to be the original defendant (Pritzker), and the "assignee" to be the third-party investor (Yari, Lincoln, or BPC, depending on the financing agreement in question). To carry out this theme, the original plaintiff (here, Dopp) would be the "assignor." Having thus introduced the generalities and particularities of article 1425, we proceed to consider its application. B. The Legal Status of the Financing Agreements. B. The Legal Status of the Financing Agreements. ____________________________________________ The financiers contend that none of their agreements with Dopp involved litigated credits subject to the strictures of article 1425. We reject this contention and hold that the financing agreements fall squarely within the purview of article 1425. Accordingly, the statute governs their legal disposition. 1. The Transfer-of-Title Theory. The financiers' 1. The Transfer-of-Title Theory. ______________________________ principal argument is that article 1425 should not be applied to the financing agreements because the statute contemplates that an assignee will actually replace, not merely bankroll, the assignor 26 in the prosecution of the latter's claim against the debtor, and that no such substitution transpired here. This amounts to a claim that article 1425 is only effective when the assignee steps into the shoes of the assignor, or, put another way, when there has been the functional equivalent of a transfer of title to all or part of the assignor's lawsuit.11 In advancing this argument, the financiers rely heavily on the historical origins of article 1425 as found chiefly in the law of Spain and France. Citing numerous treatises and tracts, they strive to persuade us that the statute, when viewed in terms of its apparent original purpose, simply does not encompass the conduct at issue here. In particular, they suggest that laws like article 1425 were designed to prevent professional litigators from stepping into a plaintiff's shoes for the specific purpose of harassing a defendant. Because that is not what happened here, thefinanciers claim the statuteis inapposite. This is all well and good, but the text of article 1425 belies the financiers' claim. The statute is drafted in terms of general applicability and its language is bereft of the slightest ambiguity. No mention is made of a transfer-of-title requirement, and, moreover, the plain language of article 1425 seems naturally suited to the scenario presented in this case. In brief, we have no reason to doubt the applicability  ____________________ 11Although we assume arguendo that all three agreements ________ created interests exclusively in the proceeds, and not the conduct, of the D/P Litigation, we note that at least one of the financing agreements Yari's could be construed as empowering the assignee to exercise substantial control over Dopp's lawsuit. 27 of article 1425 to the financing agreements, and thus to Pritzker's efforts to redeem the interests they created, unless we are prepared to wander beyond the four corners of the statute in search of some ancient legislative intent. We cannot justify undertaking such extra-textual measures in this case, especially given the interpretive command of the Puerto Rico legislature: "When a law is clear and free from all ambiguity, the letter of the same shall not be disregarded, under the pretext of fulfilling the spirit thereof." P.R. Laws Ann. tit. 31, 14 (1967 & Supp. 1989). Therefore, we reject the financiers' argument that article 1425 should be read to impose a transfer- of-title requirement.12 Compare Riseman, supra, at 460 _______ _____ (construing Louisiana's litigated credit statute, which, like the Spanish and Puerto Rico statutes, had its immediate origin in the French Civil Code and its ultimate origin in the Roman Lex ___ Anastasiana or Lex Per diversas et Ab Anastasio, and explaining ___________ _________________________________ that it "merely provides for the nullity of the purchase of  ____________________ 12Yari tries to justify a transfer-of-title construction by asserting that the district court's application of article 1425 to his agreement with Dopp renders meaningless the statute's third sentence, which authorizes the debtor to extinguish a litigated credit "within nine (9) days, counted from the day the ___ assignee should demand payment of him." P.R. Laws Ann. tit. 31, ______________________________________ 3950 (1991) (emphasis supplied). In Yari's view, this language requires that there have been a transfer of title from the assignor to the assignee, including a transfer of the right to proceed against the debtor. We decline to read the statute in so crabbed a manner. While this language unquestionably provides debtors in transfer-of-title situations with a temporal guidepost for effectuating a redemption (at least in certain situations, see infra Part III(C)), it does not thereby restrict the ___ _____ statute's overall scope. At best, the phrase to which Yari clings is designed to address a particular subset of litigated credits, not the mine-run. 28 litigious rights, and the litigious right itself is not annihilated. Thus title to the litigious right remains in the original owner, and he still has the right to proceed against his debtor for the amount owed to him."). In following this course, we are not suggesting that historical analyses or foreign legal sources are intrinsically irrelevant in parsing the laws of Puerto Rico. We recognize that the Spanish Civil Code, in particular, may sometimes constitute significant authority in the interpretation of the Puerto Rico Civil Code. See Republic Sec. Corp. v. Puerto Rico Aqued. & ___ ____________________ _____________________ Sewer Auth., 674 F.2d 952, 958 (1st Cir. 1982); see also ____________ ___ ____ Bonillerse v. Gonzalez, 17 P.R.R. 1084, 1090 (1911) (explaining __________ ________ that Puerto Rico courts sometimes "can look to eminent Spanish authors for the proper interpretation of such portions of our Civil Code as are copied literally from the Civil Code of Spain"). But recourse to these extrinsic sources is neither necessary nor appropriate when, as now, the text of a particular Code provision is unambiguous.13  ____________________ 13Our unwillingness to rely upon extra-textual sources in this instance is reinforced by our reservations about the historical-exegetical enterprise advocated by the financiers. From a practical standpoint, we question the wisdom and utility of invoking ancient doctrines, gleaned from the writings of long- deceased expositors, as a means of interpreting statutes to govern the present day and age. Nor is this concern original with us. See, e.g., Diaz Irizarry v. Ennia, N.V., 678 F. Supp. ___ ____ _____________ ___________ 957, 962 n.5 (D.P.R. 1988) ("Romantic as working with the Civil Code may be, the clock cannot be turned back. It must be kept in mind that the application of Spanish law to problems arising from basic socioeconomic structures . . . which operate under standards stemming from federal or American law is consistent with neither practical reality and efficiency nor the sources of law actually being applied in Puerto Rico today."); see also ___ ____ 29 2. The "Legitimate Purpose" Theory. Yari proposes 2. The "Legitimate Purpose" Theory. _________________________________ that article 1425 is inapplicable to these financing agreements since the right of redemption does not attach when the assignment is made for a legitimate purpose, and that obtaining financing to carry on pending litigation, as Dopp purportedly set out to do, is such a purpose. This argument founders for the most abecedarian of reasons: the statute itself contains no such exception, and the statutory text is not sufficiently problematic to invite judicial editing that might lead to the possible recognition of such an exception. As a fundamental principle of statutory construction, we will not depart from, or otherwise embellish, the language of a statute absent either undeniable textual ambiguity, see United ___ ______ States v. Charles George Trucking Co., 823 F.2d 685, 688 (1st ______ _____________________________ Cir. 1987) (expounding the primacy of plain meaning), or some other extraordinary consideration, such as the prospect of yielding a patently absurd result, see Sullivan v. CIA, 992 F.2d ___ ________ ___ 1249, 1252 (1st Cir. 1993) ("Courts will only look behind statutory language in the rare case where a literal reading must be shunned because it would produce an absurd outcome, or when the legislature has blown an uncertain trumpet.") (citations omitted); see also Colonos de Santa Juana v. Sugar Bd., 77 P.R.R. ___ ____ ______________________ _________ 371, 374 (1954) (stressing the need, "wherever possible, [to]  ____________________ Oliver Wendell Holmes, Jr., The Path of the Law, 10 Harv. L. Rev. ___________________ 457, 469 (1897) ("It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV."). 30 avoid an interpretation of a statute which would lead to an unreasonable result"), aff'd, 235 F.2d 347 (1st Cir.), cert. _____ _____ denied, 352 U.S. 928 (1956). ______ When interpreting a Puerto Rico statute, we must be faithful not only to conventional rules of construction, but also to the legislature's specific directives. One such directive is the edict that unambiguous statutes must be construed according to their letter. See P.R. Laws Ann. tit. 31, 14; see also ___ ___ ____ Roman v. Superintendent of Police, 98 P.R.R. 667, 671 (1966) _____ _________________________ (adverting to 14 and admonishing that, when a statute is clear and explicit, courts have no authority to add limitations or restrictions that do not appear on its face). This command carries unusual import in this situation, since the legislature has expressly carved out three distinct exceptions to the textual scope of article 1425. See P.R. Laws ___ Ann. tit. 31, 3951 (1991) (excluding "assignments or sales made: (1) To a coheir or co-owner of the right assigned[;] (2) To a creditor in payment of his credit[; or] (3) To the possessor of an estate, subject to the right in litigation which has been assigned"). The financiers' proposed exception is not to be found in this compendium. As the maxim teaches, "expressio unius _______________ est exclusio alterius." So it is here. Consequently, Yari's _____________________ "legitimate purpose" argument must fail, as it asks us to engraft an exception beyond those enumerated, and does so in the face of 31 unambiguous statutory text.14 3. The "Fixed Price" Theory. Next, Yari maintains 3. The "Fixed Price" Theory. _________________________ that article 1425 applies only to contracts involving a fixed purchase price, and that his agreement with Dopp does not qualify in view of its somewhat novel line-of-credit feature. Because article 1425 itself has nothing to say about whether or when a price is fixed, we think this argument collapses by virtue of the same legal principle previously discussed: a fixed price requirement does not appear on the face of the statute and can have no bearing on the interpretation of it. In a transparent attempt to elude the force of plain meaning, Yari hawks an alternative construction of article 1425. He asserts that because the statute speaks in the past tense, it only relates to assignments that constitute, or have constituted, fully closed transactions. We think that this is anfractuous reasoning, yielding an undesirable, overly cramped construction of the statute. What is more, to the extent that this construction can be regarded as importing uncertainty into article 1425, the proper interpretive course would not be to retreat into formalism, as Yari suggests, but, rather, to distill and advance the "reason and spirit" of the statute. See P.R. ___ Laws Ann. tit. 31, 19 (1967 & Supp. 1989) ("The most effectual and universal manner of discovering the true meaning of a law,  ____________________ 14We do not intend to imply that the legitimacy of Dopp's purpose in forging these financing agreements is altogether evident from the record. Rather, our disposition of Yari's argument renders further exploration of this point unnecessary. 32 when its expressions are dubious, is by considering the reason _________________________________ and spirit thereof; or the cause or motives which induced its enactment.") (emphasis supplied). Here, the policy behind the statute to discourage litigious profiteering would be disserved by allowing an assignee to avoid redemption merely by using something other than a fixed price as the consideration for his purchase. Thus, even if there is ambiguity within the text of article 1425 a proposition to which we do not subscribe Yari's proposed construction is so isthmian as to offend the reason and spirit of the statute. Because the text of article 1425 plainly covers the financing agreements, the district court correctly ruled that the statute governed their disposition. C. The Timing of the Tender. C. The Timing of the Tender. ________________________ The next snare set by the financiers is contrived from a number of alleged improprieties which, they claim, render Pritzker's efforts to extinguish the credits invalid. Most of these assertions rest on the financiers' particular construction of article 1425, and, therefore, have no continuing legal relevance in light of our understanding of that statute. See ___ supra Part III(A)-(B). Withal, the financiers raise a colorable _____ question as to the positioning and shape of the nine-day window, established in the third sentence of article 1425. We address this question. 33 The district court determined that the period in which Pritzker's article 1425 rights became operative "commenced on the date Pritzker knew officially that the assignments had been made." Pritzker v. Yari, supra, at *7, slip op. at 17. Since ________ ____ _____ Pritzker acquired the requisite knowledge on October 9, 1992, and notified the parties of his intentions exactly one week later, "Pritzker therefore duly exercised his rights within the time provided by the statute." Id. ___ The district court's finding that Pritzker first learned of the litigated credits on October 9 is not open to attack.15 This finding does not fully answer the question raised, because the financiers maintain that, even so, the statute obligated Pritzker not simply to offer to tender the _____ funds necessary for redemption within the nine-day period, but also actually to tender those funds or, at the very least, deposit them with the court. Judge Pieras rejected this analysis, ruling that the law required Pritzker, during the nine- day interval, merely to offer to tender the amounts necessary to acquire the interests then held by the assignees. See id. We ___ ___ think that the rejection of the financiers' temporal challenge is supportable, but we anchor it in a somewhat different, less confining rationale. The parties and the district court saw the question as  ____________________ 15If anything, this finding may not give sufficient range to Pritzker's rights; while Dopp disclosed the existence of the _________ financing agreements on October 9, Pritzker probably did not receive actual notice until October 12 or thereabouts. 34 a matter of what actions had to be taken within the nine-day period. The financiers claimed that a debtor must actually tender the funds, or deposit them in the registry of the court, whereas the court, adopting a thesis urged by Pritzker, concluded that a debtor need only offer a tender or deposit of the funds. Both of these positions assume that the nine-day period is applicable to the litigated credits at issue here. We question this threshold assumption. On reflection, a third construction of this portion of article 1425 presents itself: the nine-day period enumerated in the third sentence speaks only of situations in which, to use the statute's words, "the assignee should demand payment of [the debtor]." Under this third construction, the sentence in question does not govern the general operation of article 1425, but, rather, only governs its operation within one particular situation.16 We think that this construction is completely plausible in light of the unqualified declaration in article 1425's first sentence to the effect that "[w]hen a litigated credit is sold, the debtor shall have the right to extinguish the same . . . ." Moreover, if this interpretation prevails, it has obvious consequences for these appeals: although it is true that, where the nine-day period applies, it applies strictly, see Consejo de ___ __________ Titulares, 93 J.T.S. 25 (slip op. at 14) ("The legal term for the _________ assigned debtor to exercise this litigious redemption is nine (9) days from the date the assignee claims payment. This term which  ____________________ 16This is not such a situation. See supra note 12. ___ _____ 35 is extinguished with the lapse of time is final, unextendable and cannot be tolled."), such rigidity is immaterial if the third sentence does not encompass the litigated credit in question.17 We are left, then, with three competing interpretations of this portion of article 1425. Yet, the task of choosing among them is less formidable than it may first appear; for purposes of this case, it suffices merely to narrow the field. Once that is done, it becomes plain that, whether or not the third sentence applies in this instance, the assigned error lacks force. If and to the extent that the third sentence of article 1425 has pertinence here, we agree with the lower court that it requires only an offer of redemption, not a full tender of funds, within the nine-day period. Any other interpretation would significantly undermine the efficacy of the statute, since it would force debtors to marshall the funds immediately on receipt  ____________________ 17Of course, even if this third construction is accepted, it does not answer the attendant question of whether the debtor's redemption efforts, once he has notice of a litigated credit, can ever be tardy. Both the spirit of the statute and common sense dictate that some temporal limit should obtain, and that a debtor's rights may, if not seasonably exercised, become stale and expire. See Pritzker v. Yari, supra, at *7, slip op. at 15- ___ ________ ____ _____ 16 (hypothesizing that the purpose behind the nine-day window "is to prevent the unfair situation of a debtor litigating at length with an assignee and then, when the assignee has prevailed, exercising the right of redemption"); Riseman, supra, at 453 _____ (discussing Louisiana's analogous statute and concluding that "[i]f, on learning of the transfer, [the debtor] continues to contest the suit, he may not, when he realizes that the judgment is about to become final or that he is going to lose the suit, avail himself of the provisions which the law has established in his favor for the purpose of terminating litigation"). Be that as it may, these appeals do not warrant a full-dress inquiry into timeliness, for Pritzker's offers plainly satisfy any timeliness rule that might apply. 36 of notice, or else forfeit their rights. Because assignees could more often than not time disclosure of their acquired interests to minimize redemption opportunities, the notice provision would become a trick box. We do not believe that the Puerto Rico legislature intended to place assignees in so advantageous a position. In our estimation, the district court's shaping of the nine-day window produces a more realistic and balanced interpretation. Faithful to the overarching statutory purpose, this reading allows the debtor merely to offer to redeem the litigated credits within the nine-day period, thus placing the assignees on notice of probable redemption, but without backing the debtor into a cash-flow corner. This is the interpretation of the third sentence of article 1425 that we believe the Puerto Rico legislature intended and that we believe the Puerto Rico courts will adopt. In an effort to salvage their competing construction through extra-textual assistance, the financiers dredge up an assortment of other provisions of the Puerto Rico Civil Code containing time restrictions, which, they suggest, ought to inform our interpretation of article 1425. Although such extra- textualism is not improper here the statute is, after all, opaque on this particular point the financiers' efforts are unavailing. For one thing, we remain unconvinced that randomly culled provisions, entirely unrelated to litigated credits, have anything worthwhile to say about the construction of article 37 1425. Cf. P.R. Laws Ann. tit. 31, 18 (1967 & Supp. 1989) ___ ("Laws which refer to the same matter, or whose object is the same, shall be interpreted with reference to each other, in order that what is clear in one may be employed for the purpose of explaining what is doubtful in another."). For another thing, to the extent that other, unrelated provisions are relevant, they seem to militate against, not in favor of, the financiers' interpretive stance. In this regard, the district court specifically noted that the legislature's use of more restrictive phrasing in article 1414, P.R. Laws Ann. tit. 31, 3924 (1991) (stipulating that "[t]he right of legal redemption cannot be exercised except within nine (9) days"), indicates that article 1425's nine-day window should be construed in a relatively liberal manner. "Had the legislature desired to place a similar restriction on the commencement of the right to redeem litigious credits, it would have used the limiting language of Article 1414, rather than the more flexible wording of Article 1425." Pritzker v. Yari, supra, at *7, slip op. at 16. In the end, all ________ ____ _____ roads lead to Rome: the financiers' interpretation stalls no matter which interpretive path one decides to follow. Having rejected the first of the three alternative constructions in favor of the second, we need not continue to pursue the selection process. If, on the one hand, the nine-day window applies that is, if the second construction prevails nothing beyond an offer to redeem is exigible at that point, and Pritzker's offer, made on day seven, undeniably meets the 38 statutory standard. If, on the other hand, the nine-day window does not serve as a generic limitation on a debtor's ability to proceed under the statute that is, if the third construction prevails it follows a fortiori that Pritzker's failure to _ ________ tender the necessary funds within nine days of receiving official notice is irrelevant, especially given his subsequent deposit of funds with the court. For the foregoing reasons, we hold that Pritzker's efforts to redeem the financiers' interests fall within the temporal compass of article 1425. D. The Redemption of the Litigated Credits. D. The Redemption of the Litigated Credits. _______________________________________ Hesiod, reputed to be a shepherd and part-time poet, wrote in Works and Days, roughly 2700 years ago, that "right _______________ timing is in all things the most important factor." But timing is not the only salient factor under article 1425: the statute mandates that the debtor "reimburs[e] the assignee for the price the [assignee] paid for [the litigated credit], the judicial costs incurred by him, and the interest on the price from the day on which the same was paid." Thus, article 1425 requires not only the correct chronology, but also the proper price. In most situations, ascertaining the proper price poses no particular problem. For instance, BPC's and Lincoln's litigated credits each involved a discrete sum that had already been transferred to Dopp at the time Pritzker first exercised his statutory rights. The add-ons "judicial costs" and "interest" are subject to easy, mathematically precise computation. 39 Neither BPC nor Lincoln disputes that, ultimately, Pritzker consigned the statutorily required amounts to the district court in respect to their assignments. Consequently, the sufficiency of Pritzker's payment to acquire the interests of these two financiers is not before us. Yari's agreement is a horse of a slightly different hue.18 It never involved a simple one-time transfer of funds. Instead, it originally involved two things a sum of money, and assistance in establishing a line of credit in exchange for a portion of the litigation proceeds. Later on, when Yari and Dopp amended their agreement, see supra note 2, the modification ___ _____ confirmed "that the parties `fully intend to move forward with the present [July 23] Agreement despite the fact that a line of credit may not be obtainable.'" Dopp III, 831 F. Supp. at 954 ________ (quoting amendment). It also suggested that, perhaps, Yari might become more personally involved in funding the D/P Litigation. See id. (describing the modification as "call[ing] for Yari to ___ ___ advance to Dopp, in an amount to be determined and to be negotiated by the parties in good faith, funds necessary to allow Dopp's prosecution of the [D/P Litigation] to proceed diligently"). Yari thereafter complied with all specific funding requests made by Dopp.19 All in all, Yari invested a total of  ____________________ 18Even so, Yari does not raise any cognizable questions concerning the computation of "judicial costs" and "interest." 19Dopp waived the contention, belatedly raised in his reply brief, that the question of Yari's compliance vel non should have ___ ___ been submitted to the jury. See Sandstrom v. Chemlawn Corp., 904 ___ _________ ______________ F.2d 83, 86 (1st Cir. 1990). More generally, we have no reason 40 $500,000, according to the district court, see Dopp III, 831 F. ___ ________ Supp. at 954, consisting of the following advances: $250,000 under the original financing agreement; $50,000 contemporaneous with the execution of the modification to the financing agreement; $100,000 on November 5, 1992; $50,000 in early December of the same year; and, finally, $50,000 in March of 1993. We need not delve too deeply into details at this time; no matter what the fine print, it is perfectly clear that Yari's obligations under his agreement with Dopp involved both cash and non-cash components. Consequently, gauging the utility of Pritzker's redemption efforts prompts us to examine the meaning and scope of article 1425's reference to "the price . . . paid" for a litigated credit. In certain respects, this is a choice between the devil and the deep blue sea. If the statute is interpreted to include only the cash component of a hybrid offer, then it may run afoul of the economic reality of the agreement. If, however, the statute extends to the non-cash component, then the twin risks of quantitative uncertainty and undesirable consequences loom, if for no other reason than that such a rule might induce contracting parties to structure financing agreements partly in kind so as to make redemption more arduous.  ____________________ to disturb the district court's finding that, despite having failed to establish a line of credit, "Yari complied with his obligations under the agreements and would be entitled to those proceeds promised him under the terms of the Agreement and qualified thereafter." Dopp III, 831 F. Supp. at 956. ________ 41 The district court opted for the former interpretation, specifically holding that "Pritzker does not assume Yari's obligations and is required to do no more to redeem the credit than to reimburse the price actually paid, plus interest and expenses." Dopp III, 831 F. Supp. at 956. To bulwark its ________ position, the court noted that "[t]he courts of Louisiana, in applying the provision of the Louisiana Civil Code which is analogous to Article 1425, have reached the same result." Id. at ___ 956 n.23 (citing Louisiana cases). Though we do not go the whole hog, we agree up to a point. We hold, as did the district court, that compliance with article 1425 did not entail Pritzker's assumption of Yari's responsibility to fund Dopp's suit against him. In respect to damages arising out of a breach of contract, it is a basic tenet of contract law that a legal remedy (e.g., a sum of money) is ____ presumptively preferable to an equitable remedy (e.g., specific ____ performance), so long as the former is adequate and ascertainable. See 3 Farnsworth on Contracts, supra, 12.4. ___ ________________________ _____ Moreover, we echo the district court's sage observation that granting specific performance would be "flatly inconsistent with the purposes of Article 1425." Dopp III, 831 F. Supp. at 955 ________ n.21. Endorsing such a remedy would force a debtor either to forgo redemption indefinitely (thus running the risk of losing his rights under article 1425) or to fund the assignor's case against him. Thus, when an article 1425 assignee, in exchange for a 42 stake in the outcome of litigation, transfers to the assignor both cash and non-cash consideration, the debtor must tender to the assignee the cash equivalent.20 Cf. Riseman, supra, at 452 ___ _____ (suggesting that if the price actually paid is lower than the price stipulated in the financing agreement, "the `redeemer' need pay only the `real' price"). It remains for us now to apply these principles to the case at hand. On this record, there is no evidence that Yari's promise to use best efforts to seek a line of credit sufficient to fund Dopp's efforts in the D/P Litigation has any demonstrable monetary value. See supra note 20. Given this void, we agree ___ _____ with the court below that Pritzker should be permitted to redeem Yari's litigated credit despite having tendered only an amount corresponding to the funds actually transferred from Yari to Dopp prior to the time Pritzker sued to enforce his asserted right of redemption.21 E. The Equitable Reduction of Yari's Litigated Credit. E. The Equitable Reduction of Yari's Litigated Credit. __________________________________________________ The district court, having determined that all three  ____________________ 20At the very least, the cash equivalent must correspond to the cash component of a hybrid offer. We take no view of whether there may be circumstances in which a debtor would have to augment the cash component by adding to it the cash equivalent of a non-cash component that has a demonstrable cash value. In this case, Yari introduced no evidence to show the value of the non- cash component; and, moreover, he never contended that Pritzker's tender must be augmented in this manner. Any possible argument in this regard is, therefore, waived. See, e.g., United States ___ ____ _____________ v. Slade, 980 F.2d 27, 30 & n.3 (1st Cir. 1992). _____ 21Neither Pritzker nor Yari contests the trial court's use of the date Pritzker filed suit as the cutoff date for purposes of redemption. We, therefore, accept Judge Pieras' selection of that date uncritically, expressing no opinion on its propriety. 43 financing agreements came within the ambit of article 1425, ruled that the arrangement between Dopp and Yari required special treatment because their pact, as structured, concerned a "rare situation[]" involving "peculiar facts." Dopp III, 831 F. Supp. ________ at 958-59. The court identified two particular concerns. First, it expressed a sensitivity "to Dopp's need to obtain funds to maintain his action against Pritzker," id. at 957, bearing in ___ mind that "Pritzker is a billionaire who could never be forced to relent in his defense," id. at 957 n.25. Second, the court ___ reflected that, "although Yari technically complied with the terms of his agreement with Dopp, he did not succeed in providing what he originally intended. As a result, Dopp never received what he hoped he had bargained for under the agreement." Id. at ___ 957. Based on these two concerns, and mindful that Pritzker stood to receive a windfall on redemption of Yari's litigated credit, the court concluded as a matter of statutory construction _____________________________________ that it "could not have been the intention" of the legislature to allow full redemption in such a situation.22 Id. at 958. The ___ court wrote: The Dopp/Yari agreement is far outside the heartland of agreements contemplated by the legislature when it enacted Article 1425. It is likely that the lawmakers did not envision the possibility of a case like this.  ____________________ 22At certain points in his appellate briefs, Dopp intimates that the district court in effect reformed the Dopp/Yari financing agreement. We do not read the court's opinion in that way; and, moreover, the record on appeal evinces no basis for an order tantamount to an order of reformation. 44 Property and assets have traditionally been mortgageable to protect and preserve their value. In this case, the lawsuit's worth is an asset which requires expenditures for the services of attorneys and experts, as well as for other general costs of litigation to preserve its value. To apply Article 1425 without allowing for adjustments to reflect expenditures that have permitted the lawsuit to survive would be to deplete and maybe extinguish altogether the value of the lawsuit . . . . Id. To ameliorate this perceived inequity, the court limited ___ Pritzker's redemptive right to one-half the credit held by Yari. See id. ___ ___ Pritzker contends that the lower court's ruling collides with the plain language and undeniable purpose of article 1425. This contention raises a question of statutory interpretation that sparks de novo review. See Gifford, 17 F.3d __ ____ ___ _______ at 472; Liberty Mut., 978 F.2d at 757.23 ____________ Exercising plenary review, we agree with Pritzker that, as a matter of law, the district court's ruling cannot stand. As with Yari's efforts to read certain unenumerated exceptions into the statute, see supra Part III(B), the district court's ___ _____ limitation on Pritzker's redemptive rights finds no purchase in  ____________________ 23Of course, a district court's equity power is relatively broad and is typically subject to deferential review when the exercise of that power is genuinely a function of the court's discretion. See 1 Steven A. Childress & Martha S. Davis, Federal ___ _______ Standards of Review 4.16, at 4-125 to 4-126 (2d ed. 1986 & ____________________ Supp. 1993). Nevertheless, such deference does not extend to whatever errors of law may underlie a district court's remedial or equitable determinations. See id. at 4-127 & n.4; see also ___ ___ ___ ____ Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 5 (1st Cir. __________________________ ________ 1991) (exempting mistakes of law from usual deferential review accompanying district court's grant or denial of injunctive relief). 45 the text of article 1425. The very existence of the litigated credit statute evinces the legislature's likely knowledge that windfalls can result when litigants barter future interests in litigation proceeds. It is thus telling that the statute's language neither suggests nor permits variable application depending upon the extent of a particular windfall, the size of a particular recovery, or the relative financial condition of particular litigants. This can only signify that, as between debtors and assignees, the legislature determined that the former, rather than the latter, more properly deserved the benefit of any trouvaille. To be sure, it is always possible that legislators, in drafting a statute, may not have considered the entire gamut of possibilities that might come within the statute's sweep. Nevertheless, "[w]hen a law is clear and free from all ambiguity, the letter of the same shall not be disregarded, under the pretext of fulfilling the spirit thereof." P.R. Laws Ann. tit. 31, 14 (1967 & Supp. 1989). In other words, courts, in Puerto Rico as elsewhere, are simply not free to disregard the unambiguous language of a law because the facts of a given case to which the law applies evoke a sympathetic reaction. See, ___ e.g., Mansell v. Mansell, 490 U.S. 581, 594 (1989) (declining "to ____ _______ _______ misread [a] statute in order to reach a sympathetic result when such a reading requires us to do violence to the plain language of the statute"); cf. East India Co. v. Paul, 7 Moo. 85, 111 ___ _______________ ____ (P.C. 1849) (admonishing that "courts of justice [must] take care 46 . . . that hard cases do not make bad law"). Nor can the court's decision be justified simply because the district judge rendered it under the rubric of equity and in "[t]he interests of justice." Dopp III, 831 F. Supp. at ________ 958. While it is true that equity occupies an honored place in the jurisprudence of Puerto Rico, judges may assume the role of chancellors only in the absence of a governing rule of positive law. See P.R. Laws Ann. tit. 31, 7 (1967 & Supp. 1989) ___ (ordaining that "[w]hen there is no statute applicable to the case at issue, the court shall decide in accordance with equity"). Here, there is an apposite statute, and, therefore, the district court's use of equitable principles to trump that statute is legally indefensible. We need go no further.24 Because the rights and obligations of Pritzker and Yari, inter sese, must be determined _____ ____ in accordance with the provisions of article 1425, unembellished by freeform concepts of equity, the halving of Pritzker's redemptive rights must be reversed. IV. CONCLUSION IV. CONCLUSION We succinctly summarize our conclusions. First, the district court appropriately exercised in personam jurisdiction __ ________ over BPC. Second, the court correctly ruled that the three  ____________________ 24Because Pritzker is entitled to redeem Yari's entire interest in the proceeds of the D/P Litigation (whatever that interest may be), there is no need to inquire into the district court's disposition of Yari's cross-claim against Dopp seeking a declaration, inter alia, that Yari is entitled to "[all] the _____ ____ rights created in his favor under the [financing] Agreement." 47 financing agreements involved litigated credits within the meaning of article 1425. Third, we hold that Pritzker's redemption efforts were both timeous and methodologically proper. Fourth, we hold that the district court lacked the authority to limit Pritzker's redemptive right to one-half of Yari's litigated credit. The district court's judgment in respect to Pritzker's _______________________________________________________ civil action is affirmed in part and reversed in part. The __________________________________________________________ ___ district court is directed to enter an amended judgment _________________________________________________________________ accordingly, when and as appropriate. Costs shall be taxed in _____________________________________ ________________________ favor of Pritzker. _________________ 48