**John B. McEVILY**

v.

**SUNBEAM–OSTER COMPANY, INC.**

**Civ. A. No. 94–0225P.**

United States District Court,
D. Rhode Island.

Dec. 16, 1994.

---

Wistow & Barylick, Inc. by Keven F. Bowen, Providence, RI, for plaintiff.

William M. Dolan, III, Brown, Rudnick, Freed & Gesmer, Local Counsel, Providence, RI, Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel by Jeffrey Allan Hirsch, Ft. Lauderdale, FL, for defendant.

### ORDER

PETTINE, Senior District Judge.

The plaintiff objects to the Report and Recommendation of the Magistrate Judge ("Magistrate") dated November 1, 1994 wherein he reviewed the defendant's motion to dismiss for improper venue pursuant to Fed.R.Civ.P. 12(b)(3), for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6) or, alternatively, motion to transfer venue to the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. § 1404(a). The Report and Recommendation is hereby accepted pursuant to 28 U.S.C. § 636(b)(1). For reasons recited in the Magistrate's report, this case is hereby transferred to the United States District Court for the Southern District of Florida.

### I.

To begin with, the plaintiff contends that a motion to transfer pursuant to § 1404(a) is a dispositive motion and thus mandates a *de novo* review by the district court. He cites no authority in support of his position which is clearly contra to this Court's ruling in *Blinzler v. Marriott Int'l, Inc.*, 857 F.Supp. 1, 2 (D.R.I.1994).[1] *See also Michelli v. City of Hope*, No. 93 Civ. 7582, 1994 WL 410964 at *1 n. 1 1994 U.S. Dist. LEXIS 10755 at *1 n. 1 (S.D.N.Y. August 4, 1994) ("A motion to transfer involves a nondispositive pretrial matter"); *Russell v. Coughlin*, No. 90 Cir.

7421, 1992 WL 209289 (S.D.N.Y. August 19, 1992); *Pemrick v. Stracher*, No. 90 CV–849, 1992 U.S. Dist. LEXIS 3729 at *1 (N.D.N.Y. March 27, 1992) (standard to be used by district court in reviewing motion for transfer of venue is "clearly erroneous or contrary to law"); *O'Brien v. Goldstar Technology, Inc.*, 812 F.Supp. 383, 384 (W.D.N.Y.1993) (referral of venue motion is pursuant to 28 U.S.C. § 636(b)(1)(A)). It is true that the referral in this case did include a dispositive motion to dismiss; however, this is of no consequence since I review only the actual disposition made by the Magistrate.

The plaintiff also improperly seeks support based on this court's decision in *Yang v. Brown University*, 149 F.R.D. 440, 442–3 (D.R.I.1993). In *Yang*, I conducted a *de novo* review of a nondispositive motion since a ruling on said motion was tantamount to a final disposition of the case. This is clearly not the case here.

█ I need labor no further—as a motion to transfer venue is a nondispositive motion, the "clearly erroneous" standard is the one to be employed in deciding this appeal.

The defendant correctly asserts that "A finding is clearly erroneous when it is against the clear weight of the evidence, or when the court has 'a definite and firm conviction that a mistake has been committed.' ... Where there are two possible interpretations of the evidence, a court's choice of one of them cannot be clearly erroneous." Defendant's brief at 7.

The Magistrate Judge, in his excellent 24 page opinion, scrupulously considered and analyzed the many factors to be considered and weighed in a venue transfer. Appreciating that the burden "is on the movant to make a strong showing that transfer of venue is appropriate under the circumstances," Report and Recommendation at 9, the Magistrate ruled that this case was to be heard and tried in Florida. I accept his factual findings and legal conclusions.

SO ORDERED:

1. As the defendant points out, and I emphasize most emphatically, *Blinzler* involves a motion to transfer venue that was advanced *by McEvily's present counsel and decided by Magistrate Judge*

*Lovegreen*. There, the court affirmed the Magistrate's Report and Recommendation which denied the motion to transfer.

*REPORT AND RECOMMENDATION*

LOVEGREEN, United States Magistrate Judge.

In this action, plaintiff, John B. McEvily, claims that his onetime employer, defendant, Sunbeam–Oster Company, Inc (defendant or the "Company") breached a stock option agreement and misrepresented the status of his options thereunder. Presently before the court are three motions. The first is defendant's motion to dismiss for improper venue pursuant to Fed.R.Civ.P. 12(b)(3), for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6) or, alternatively, motion to transfer venue to the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. § 1404(a). That motion was filed May 23, 1994. The second motion, filed on August 1, 1994, is the defendant's motion to stay discovery during the pendency of the defendant's motion to dismiss. The third motion, filed on August 12, 1994, is the plaintiff's motion to compel production of documents set forth in the plaintiff's first request for production of documents.

The defendant's motion to dismiss has been referred to me for preliminary review, findings and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule of Court 32(c)(1). The defendant's motion to stay discovery and the plaintiff's motion to compel have been referred to me for disposition pursuant to 28 U.S.C. § 636(b)(1)(A) and Local Rule of Court 32(b)(1). Based on the following analysis, I recommend that the defendant's motion to transfer this case to the United States District Court for the Southern District of Florida be granted. By separate order, the defendant's motion to stay discovery is denied as moot and disposition of the plaintiff's motion to compel is passed.

*Facts*

The plaintiff is a resident of Burr Hill, Illinois. From approximately April, 1991 through January 3, 1994, the plaintiff was employed by the Company as General Manager of Sunbeam Precision Management, one of the Company's subsidiaries. During a portion of his employment with the Company, he also held the position of Vice–President for Business Development.

The Company is a Delaware corporation. Prior to October, 1993, the Company's principal place of business was in Providence, Rhode Island. Between October and December, 1993, the Company relocated to Fort Lauderdale, Florida, and now, its administrative functions are centralized and its senior officials, management personnel and corporate records are located at the Fort Lauderdale headquarters.

On or about December 15, 1991, the Company granted to plaintiff 124,783 options to purchase an equal number of common shares of the Company's common stock, exercisable over a four-year period. This grant of options was memorialized in Sunbeam–Oster Option to Purchase Common Stock No. 00081 (Beauregard Supp. Aff., ex. B) which incorporated by reference the Sunbeam–Oster Equity Team Plan (the "Plan") (Pl.'s Mem. of Law in Opp. to Def.'s Mot. to Dismiss ("Pl.'s Mem."), ex. B), containing the details and procedural aspects of the grant. Pursuant to the Plan, plaintiff was entitled to exercise 20% of his options on January 1, 1992, another 20% on January 1, 1993, 30% on January 1, 1994 and the final 30% on January 1, 1995. *Id.* at 11. The Plan also contained a provision making all the options held by the plaintiff immediately exercisable in full if a "change in control" of the Company occurred and the plaintiff was still an employee. *Id.* ¶ 4(c). "Change in control" is defined by the Plan as

The occurrence of any of the following: (i) any "person" as such term is used in Sections 13(d) and 14(d) of the Exchange Act, other than an entity owned directly or indirectly by the Beneficial Owners of in excess of 50% of the combined voting power of the Company's outstanding securities on the Effective Date, becomes the Beneficial Owner, directly or indirectly, of securities of the Company representing 50% or more of the combined voting power of the Company's then outstanding securities, or (ii) a transaction or series of related trans-

actions that results in the sale of all or substantially all of the Company's assets. *Id.* ¶ 15.

Plaintiff alleges in his complaint that sometime between January and April of 1993, a "change in control" of the Company occurred, making all of plaintiff's options under the Plan immediately exercisable. (Complaint ¶ 9.) In his opposition to the defendant's motion to dismiss, plaintiff explains that from September, 1990 to sometime in January, 1993, Paul Kazarian ("Kazarian") was the Chief Executive Officer of the Company, Chairman of its Board of Directors and the "beneficial owner" of 99.2% of the Company's common stock through his ownership interests in a complex multi-level scheme of other entities. Plaintiff further alleges that sometime between January and April of 1993, Kazarian was ousted as Managing Director of the Company, as Chairman of the Board of Trustees and later as Director of the Company. During this same time period, Kazarian was divested of his "beneficial ownership" of the Company's stock, thereby creating a "change in control" of the Company.

Plaintiff also alleges in his complaint that officers of the Company misrepresented to plaintiff that no "change in control" had in fact occurred upon Kazarian's ouster. (Complaint ¶¶ 13 and 18.) Again, plaintiff elaborates in his opposition memorandum that in early 1993, he attended a meeting conducted by Michael G. Lederman ("Lederman"), who then held the positions of Director, Vice President, Secretary and General Counsel of the Company. The meeting was also attended by Henry Rauzi ("Rauzi"), the Controller and Vice President of the Company and Robert H. Setrakian ("Setrakian"), Treasurer and Vice President of the Company. Lederman, Rauzi and Setrakian all stated unequivocally that no "change in control" had resulted from Kazarian's ouster and that their stock options had not been affected in any way.

In September, 1993, Charles J. Thayer, the Company's Vice Chairman, advised plaintiff that his employment with the Company would be terminated. Plaintiff was concerned about his prospective inability to exercise the remainder of his stock options under the Plan. The parties then entered into a Settlement Agreement on September 15, 1993 which governed the remainder of plaintiff's employment relationship with the Company. (Fannin Aff., ex. A.) The Settlement Agreement recited that 40% of plaintiff's stock options under the plan had vested and been exercised, and that on January 2, 1994, an additional 30% of his options would vest pursuant to the plan. *Id.* at 1. Plaintiff acknowledges that at the time he signed the Settlement Agreement, this recital was his understanding of the state of his options under the Plan, based on the misrepresentations of the Company's officers at the meeting in January, 1993. Plaintiff also acknowledges that he thought he would be forfeiting the final 30% of his options, because he would not be employed by the Company on January 1, 1995.

Under the agreement, the Company agreed to continue to employ the plaintiff to January 2, 1994 and to provide him monthly compensation and a severance payment. *Id.* §§ 1 and 4. The plaintiff expressly waived all benefits either vested or unvested except for certain specified benefits, including those under the Plan, and released the Company from any and all actions, suits or claims whether known or unknown occurring prior to the date of the Settlement Agreement. *Id.* § 6. The Settlement Agreement also provided:

> The parties expressly acknowledge that this Agreement does not modify or supersede, but rather is supplemental to, the terms of [the Plan] and that each and every term of [the Plan] shall remain in full force and effect and which shall specifically continue to vest all rights and interests in Employee's name during, but limited to, the Term. This Agreement shall control as to any conflicts between this Agreement and [the Plan].

*Id.* § 7. Lastly, the Settlement Agreement stated that it was to be "enforced and construed under the laws of the State of Delaware and any controversy arising form the obligations set forth hereunder shall be initiated in the state or federal courts of the State of Florida." *Id.* § 10(e).

Plaintiff did exercise the 30% of his options that the Settlement Agreement recited as vesting on January 2, 1994. In early 1994, after plaintiff learned of the alleged "change in control" that occurred in 1993, his attorney inquired with the Company about this "change in control" and the final 30% of his options. The Company again denied that such "change in control" had occurred and, according to plaintiff, "rebuffed" his attorney's efforts to exercise the options. The Company points out that in February, 1994, its Group Counsel and Assistant Secretary, Michael Beauregard ("Beauregard"), did deny to plaintiff's attorney that any "change in control" had occurred, but that the Company did not "rebuff" any attempt by plaintiff to exercise the final 30% of the options at issue. In fact, the Company contends that plaintiff did not follow any of the required procedures to exercise such options if they were available to plaintiff.

The Company contends that dismissal of this action is required, because it is governed by the Settlement Agreement, and the forum selection clause therein prohibits this suit from being brought in any court outside of Florida. Moreover, the Company argues that until the venue issue is resolved, the only permissible discovery is that related to the venue issue; therefore, plaintiff's discovery requests relating to the merits of the case should be stayed. Plaintiff's counter is twofold. First, he argues that the present controversy is governed by the Plan and not the Settlement Agreement. Alternatively, to the extent the Settlement Agreement controls this controversy, it is unenforceable because the plaintiff entered into it based upon the Company's misrepresentations and would not have executed it had the Company correctly informed him regarding the alleged "change in control" in early 1993. Consequently, plaintiff contends that discovery on the merits of the case is necessary to a determination of the venue issue, as the court must determine the intent of the parties regarding the Settlement Agreement and whether the Company in fact did misrepresent that no "change in control" had occurred. Both parties agree, that in the event that the forum selection clause in the Settlement Agreement does not control, that the court should decide whether the case should be transferred to the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. § 1404(a).

### Discussion

■■■ Clearly, if the forum selection clause of the Settlement Agreement controls, this suit cannot remain before this court and must proceed in Florida. The parties raise a number of issues related to the merits in disputing whether the Settlement Agreement's forum selection clause does control. Addressing the merits of the case at this early juncture is not necessary though. A review of the parties arguments regarding transfer of this case pursuant to 28 U.S.C. § 1404(a) convinces me that Florida is the appropriate venue for this suit. Thus, even if plaintiff could convince the court that the forum selection clause did not control, requiring suit to be brought in Florida, the case should be transferred there anyway. Thus, I turn directly to the § 1404(a) analysis.

28 U.S.C. § 1404(a) states:

For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

Along with the convenience of the parties and witnesses, courts have considered a number of private and public interests pursuant to § 1404(a). The private interests include:

1) the availability of compulsory process for attendance of unwilling witnesses;

2) the cost of obtaining attendance of willing witnesses;

3) the relative ease of access to sources of proof;

4) the possibility of a view of premises, if such a view would be appropriate to the action; and

5) all other practical problems that make trial of a case easy, expeditious and inexpensive.

*Paradis v. Dooley,* 774 F.Supp. 79, 82 (D.R.I. 1991) (citing *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed.

1055 (1947)). The public interests weighed in this analysis are:

1) the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action;

2) the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law;

3) the local interest in having localized controversies decided at home;

4) the unfairness of burdening citizens in an unrelated forum with jury duty; and

5) administrative difficulties flowing from court congestion.

*Id.*

■ "Section 1404(a) is intended to place discretion in the District Court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'" *Blinzler v. Marriott International, Inc.*, 857 F.Supp. 1, 3 (D.R.I.1994) (quoting *Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 29, 108 S.Ct. 2239, 2243, 101 L.Ed.2d 22 (1988)). The plaintiff's choice of forum is generally entitled to great weight. *Id.; Paradis v. Dooley*, 774 F.Supp. at 82; *SW Industries, Inc. v. Aetna Casualty and Surety Co.*, 653 F.Supp. 631, 637 (D.R.I.1987). Therefore, the burden is on the movant to make a strong showing that transfer of venue is appropriate under the circumstances. *Paradis*, 774 F.Supp. at 82; *SW Industries, Inc.*, 653 F.Supp. at 637. This burden is lightened when a plaintiff has not brought suit on his "home turf" or at the site of the activities at issue in the law suit. *SW Industries, Inc.*, 653 F.Supp. at 637. The present plaintiff is not suing on his "home turf," as he is an Illinois resident. (Complaint ¶ 1.) Further, the activities complained of are an alleged breach of contract that occurred when the Company allegedly rebuffed plaintiff's attempted exercise of the final 30% of his options in Florida and statements made by Lederman and Setrakian at the meeting in early 1993. The site of these activities is of little importance to this action, as their particular location has no real connection to the contract and misrepresentation claims plaintiff is making. Thus, the burden

on the Company in the present case is somewhat lightened. Nevertheless, "[a] showing of inconvenience to the defendant is not sufficient for the granting of § 1404(a) relief, where the transfer would merely shift the inconvenience to the other party." *Blinzler v. Marriott International, Inc.*, 857 F.Supp. at 3.

**A. Convenience to the Parties.**

■ As mentioned, plaintiff is a resident of Illinois, not Rhode Island. Therefore, maintenance of this suit in Rhode Island, rather than Florida, will not be any more convenient to the plaintiff. Further, to the extent plaintiff chose Rhode Island to facilitate the use of his current Rhode Island counsel, this fact is entitled to little, if any, weight. *Pennwalt Corp. v. Purex Industries, Inc.*, 659 F.Supp. 287, 290 (D.Del.1986); *Bolton v. Tesoro Petroleum Corp.*, 549 F.Supp. 1312, 1317 (E.D.Penn.1982).

The Company on the other hand is headquartered in Florida; all of its witness-employees work in Florida and have testified by affidavit that trial in Rhode Island would significantly disrupt the performance of their duties for the Company. Consequently, transfer of the case to Florida would minimize disruption of the Company's business and be correspondingly more convenient for the Company. *See Bolton v. Tesoro Petroleum Corp.*, 549 F.Supp. at 1316; *Goodman v. Fleischmann*, 364 F.Supp. 1172, 1175 (E.D.Penn.1973).

Lastly, while the means of the parties may be considered, they do not tip the balance in either party's favor in this case. The Company has the resources to defend this action in Rhode Island, and while plaintiff may not have the same resources as a corporation, he has indicated that if the case is transferred to Florida, he will be able to continue to prosecute it in that forum. Therefore, on balance, the convenience of the parties favors the Company to a large extent.

**B. Convenience of the Witnesses, Availability of Compulsory Process for Attendance of Unwilling Witnesses and Cost of Obtaining the Attendance of Willing Witnesses.**

■ "The convenience of witnesses is said to be a primary, if not the most impor-

tant, factor in passing on a motion to transfer under § 1404(a). This factor involves not merely a consideration of the number of witnesses located in or near the respective forums, but the nature and quality of their testimony in relationship to the issues of the case." *Houk v. Kimberly–Clark Corp.*, 613 F.Supp. 923, 928 (W.D.Mo.1985) (citations omitted). Parties must state with particularity, by way of proof or affidavit, what witnesses are to be called and what the nature of their testimony and the extent of their inconvenience will be. *See Blinzler v. Marriott International, Inc.*, 857 F.Supp. at 3; *Salperto v. Pohlad*, 1994 U.S. Dist. Lexis 161, *7 (D.Del.1994); *Essex Crane Rental v. Vic Kirsch Construction*, 486 F.Supp. 529, 535 (S.D.N.Y.1980).

The Company has specified that it would call four witnesses at trial and has provided affidavits from each one. Charles J. Thayer, currently a Director of the Company, was its Vice Chairman in mid-September, 1993 when he met with the plaintiff and informed him he would be terminated. He is a Florida resident where he owns and operates his own business. He stated in his affidavit that appearing to testify in Rhode Island would make it very difficult for him to conduct his business. (Thayer Aff. ¶ 3.) He is expected to testify at trial that in response to plaintiff's concern about his stock options, the Company agreed to continue his employment until January 1, 1994 so that he could exercise the next 30% of his options. *Id.* ¶ 5. Thayer will also testify that plaintiff sought only to preserve the next 30% of his options, and the final 30% was not intended to be preserved by plaintiff's continued employment through January 1, 1994. *Id.* ¶ 6. Further, Thayer states that he never discussed any change in control of the Company with the plaintiff. *Id.* ¶ 8.

David C. Fannin is currently a resident of Florida and since January 1, 1994, has been the General Counsel and Secretary to the Company. (Fannin Aff. ¶ 2.) Previously, Fannin served as Special Counsel to the Company from June 25, 1993 through December 31, 1993. *Id.* The Company contends that "Fannin's testimony is material to the intent of the parties to the Settlement Agreement and the process by which their mutual understanding was memorialized." (Def.'s Mem. of Law in Supp of Mot. to Dismiss ("Def.'s Mem.") at 16.) Fannin's affidavit is not specific as to what that intent was. It simply states that Fannin supervised the drafting of the Settlement Agreement and "spoke to [plaintiff] about the terms which had been discussed with Mr. Thayer and confirmed his understanding as to the period of time for which his compensation was to be continued and the vesting of stock options through the end of the year. The purpose of these discussions was to ensure that the document accurately reflected the terms which had been agreed to by Messrs. Thayer and McEvily." *Id.* ¶ 7. He further states that he did not discuss any issue of change in control of the Company. *Id.* ¶ 13. Therefore, while his testimony may prove useful to the Company at trial, on the record to date it is not clear whether he will be able to testify in support of the Company's contention that both parties intended that plaintiff would only be reserving the next 30% of his stock options and would be unable to exercise the final 30% at any time.

Michael R. Beauregard is employed as Group Counsel and Assistant Secretary to the Company and has held that position since February 6, 1991. (Beauregard Aff. ¶ 2.) He is a resident of Illinois but spends a substantial amount of his time working at the Company's Florida headquarters. *Id.* Beauregard drafted the Settlement Agreement and "understood that the Settlement Agreement contemplated a continuation of Mr. McEvily's employment long enough to satisfy the conditions of the stock option program for the exercise of the 30% of his stock options that would have vested in 1993." *Id.* ¶¶ 6 and 7. After reviewing the Plan, Beauregard specified in the Settlement Agreement that plaintiff would be permitted to exercise 37,434, or 30%, of his options on or after January 1, 1994. Plaintiff made no changes to this statement. *Id.* ¶ 7. In February, 1994 Beauregard did discuss with James Van Vliet, plaintiff's counsel at the time, whether any change in control of the Company had occurred but denied that such

an event had occurred. *Id.* ¶ 11. Beauregard never discussed the issue of change in control with the plaintiff directly. *Id.*

Lastly, Kelly Campbell is a resident of Florida and has been employed by the Company as a Legal Assistant since February 11, 1991. (Campbell Aff. ¶ 2.) As such she is responsible for administering the exercise of stock options by Company employees. *Id.* ¶ 3. Campbell will testify as to the required procedures for an employee to exercise his or her options under the Plan and that while plaintiff complied with these procedures when he exercised the 70% of his options that are not at issue, he did not submit any of the required forms or payment with respect to the final 30% of his options that are at issue. *Id.* ¶¶ 4, 5 and 6. Campbell likewise did not discuss any change in control of the Company with the plaintiff. *Id.* ¶ 8.

The Company has effectively established the importance of its witnesses, except possibly Fannin, to the issues present in this trial. Thayer and Beauregard are qualified to offer testimony regarding the formation of the Settlement Agreement and their opinions of its intended effect. The trial judge in this matter may find such testimony necessary to resolve the apparent ambiguity as to the intended effect of the Settlement Agreement. Campbell, can offer evidence that may go towards the issue of whether the Company actually did "rebuff" plaintiff's efforts to exercise the final 30% of his options in light of the fact that he allegedly did not follow the required procedures to exercise them.

■■■ The Company's witnesses cannot be considered to be inconvenienced by a trial in Rhode Island simply because it would interfere with the performance of their duties for the Company. Clearly, as employees of the Company, they have an incentive to travel to Rhode Island and testify in support of their employer. *Sterling Novelty, Inc. v. Smith,* 700 F.Supp. 408, 410 (N.D.Ill.1988). Nevertheless, these witnesses would clearly be personally inconvenienced by having to interrupt their lives to travel to Rhode Island to testify. Thayer's personal inconvenience would most likely be the greatest as his personal business would suffer if his presence was required in Rhode Island for trial. Beauregard, on the other hand, cannot be included

in this group because he lives in Illinois. Still, he does work for the Company and spends a substantial amount of his time in Florida. Thus, a trial in Florida, rather than Rhode Island, would presumably be more personally convenient for him as well. On the whole, therefore, it would be far more convenient to the Company's witnesses and far less costly for the Company to obtain their attendance if this trial were to proceed in Florida.

Plaintiff attempts to lighten some of the inconvenience to the Company's witnesses by stating that "the proposed relevant testimony of Kelly A[.] Campbell is uncontested, and she need not appear at trial." (Pl.'s Mem. at 21.) As yet though, no stipulation as to this fact is in the record. Accordingly, it is inappropriate at this juncture for the court to discount the Company's need to call this witness.

The plaintiff indicates that he intends to call seven witnesses at trial, only four of which are Rhode Island residents. Plaintiff states that Paul Kazarian, the ex-CEO of the Company, is a Rhode Island resident and will be called to testify most importantly about "the complex manner in which he, through entities he controlled, effectively controlled the stock of [the Company]," which will purportedly demonstrate that a change of control did occur. (McEvily Aff. ¶ 12.A.)

Plaintiff contends that Michael Lederman is also a resident of Rhode Island and is expected to testify as to his knowledge of the alleged change in control and his own statement at a meeting in early 1993 that no change in control over the Company had occurred upon Kazarian's ouster. *Id.* ¶ 12.B. Robert Setrakian is expected to testify as to Kazarian's control over the stock of the Company and as to his alleged statement at the meeting in early 1993 that no change in control had occurred. *Id.* ¶ 12.C. Setrakian, though, is not a Rhode Island resident but lives and works in New York. (Sargent Aff. ¶ 3.) Like Setrakian, Mark Benjamin, a former Administrator of the Plan for the Company, is also not a Rhode Island resident. Rather, he lives and works in New Mexico. *Id.* Unlike Setrakian though, plaintiff's explanation of Benjamin's expected testimony

is less clearly relevant to the issues in dispute in this case. Specifically, plaintiff expects that Benjamin will "testify as to the establishment of the [P]lan, the manner in which it was administered, the knowledge of high level Company officials that the issue of whether a Change in Control had occurred had been raised, and the fact that the Company developed a standard response to inquiries in this regard, to the effect that no Change in Control had occurred." (McEvily Aff. ¶ 12.D.) None of this specifically relates to whether a change in control occurred or whether the Company knew that a change in control had occurred and misrepresented to the plaintiff that it had not.

Plaintiff has also indicated that he may call Sam Fahmy ("Fahmy") and John DeSimone ("DeSimone") to "corroborate some of the testimony of the witnesses identified above." *Id.* ¶ 12.F. While the Company does not dispute that Fahmy is a Rhode Island resident, it does point out that DeSimone is employed at the Company's headquarters in Florida and lives in Fort Lauderdale. Lastly, plaintiff states that he will call Ann Coppola ("Coppola"), a Rhode Island resident who worked in the Company's accounting department, to testify that the Settlement Agreement was similar to that offered to other Company employees. *Id.* ¶ 12.E It is intended that her testimony will demonstrate that the Company did not confer any extra benefits upon plaintiff in return for him relinquishing any vested rights. *Id.*

On balance, the convenience of witnesses favors the Company. Three of plaintiffs seven witnesses do not live in Rhode Island. Therefore, a trial in Rhode Island would be no more convenient for them than trial in Florida, especially DeSimone, for whom a trial in his home state of Florida would be of much greater convenience. Further, there is little doubt that Kazarian and Lederman's testimony is relevant, despite the Company's unstipulated contention that it does not dispute that plaintiff would have been told that no change in control occurred. Coppola and Fahmy's testimony seems on the other hand to be of little relevance. In regards to Coppola, a showing that plaintiff did not receive any "extra benefits" in exchange for giving up vested rights does not mean that he could not have agreed to forfeit the final 30% of his options in exchange for the consideration presented in the Settlement Agreement. Plaintiff has made no argument that the Settlement Agreement was devoid of the necessary consideration for the relinquishment of such vested rights. Fahmy's testimony is inconsequential in this § 1404(a) analysis because it is cumulative and therefore, not entitled to great weight. *Board of Trustees v. Baylor Heat and Air Conditioning,* 702 F.Supp. 1253, 1258 (E.D.Va.1988). Thus, we are left comparing the convenience of Kazarian and Lederman to that of the Company's witnesses.

This comparison dovetails with the plaintiff's assertion that jurisdiction should remain in this court, because compulsory process may be necessary to compel Kazarian and Lederman's testimony at trial. Plaintiff asserts that Kazarian and Lederman are potentially hostile, because on plaintiff's "information and belief" they are "bound by a covenant of silence and non-disclosure entered into with the Company and others concerning the events referred to in the Complaint." (McEvily Aff. ¶ 13.) This contention cuts a number of ways, none of which favor the plaintiff when viewed in the context of the dual qualitative and quantitative analysis required in balancing the convenience of witnesses. *See Houk v. Kimberly–Clark Corp.,* 613 F.Supp. at 928.

 Plaintiff must state with particularity why it is a particular witness weighs in favor of this court retaining jurisdiction. *See Blinzler v. Marriott International, Inc.,* 857 F.Supp. at 3; *Salperto v. Pohlad,* 1994 U.S. Dist. Lexis 161, *7; *Essex Crane Rental v. Vic Kirsch Construction,* 486 F.Supp. at 535. The Company has provided affidavits from each of its expected witnesses establishing in their own words the import of their testimony on the Company's case. Plaintiff on the other hand has provided his best estimate as to what Kazarian and Lederman will testify to. Then, plaintiff indicates that they may prove to be hostile to his cause. This delineation of expected testimony is certainly less definite than the Company's. In fact, it is not illogical to forecast that Kazarian and

Lederman may avoid testifying for plaintiff altogether or may testify contrary to plaintiff's position in this controversy. Thus, plaintiff's contentions regarding Kazarian and Lederman's testimony do not present the kind of hard information based on personal knowledge necessary to outweigh the convenience to the Company's witnesses of having trial in Florida, established by their own testimony through affidavit. Without more, I cannot attribute the overwhelming weight to these witnesses that plaintiff would wish. Nevertheless, even assuming *arguendo* that while Kazarian and Lederman may be hostile to plaintiff, their testimony would be supportive of plaintiff's cause, this is still not enough to militate against transfer in light of clearly greater convenience to the Company's witnesses referred to above, especially in light of the fact that plaintiff can depose Kazarian and Lederman in this district, by video or standard means, and use their depositions at trial. *See Houk v. Kimberly–Clark Corp.*, 613 F.Supp. at 931 (noting that video-taped depositions can be used where not shown to be inadequate); *Bolton v. Tesoro Petroleum Corp.*, 549 F.Supp. at 1317 ("The Court takes notice of the fact that the use of discovery techniques such as videotaped depositions can make demeanor evidence available to a jury even when witnesses are not physically present at trial.") Therefore, the convenience to Kazarian and Lederman and the potential need for compulsory process to procure their testimony is not of sufficient consequence to outweigh the convenience to witnesses in favor of the Company of having trial in Florida.

### C. Ease of Access to Proof and Location of Documents.

These factors unquestionably weigh in favor of the Company. The location, transportation and storage of a large quantity of documents is a factor that can militate in favor of transfer. *SW Industries, Inc. v. Aetna Casualty and Surety Co.*, 653 F.Supp. at 638; *Pennwalt Corp. v. Purex Industries, Inc.*, 659 F.Supp. at 290; *Bolton v. Tesoro Petroleum Corp.*, 549 F.Supp. at 1316. As was pointed out above, one of the matters presently being considered is the parties' dispute over plaintiff's need for extensive discovery from the Company. Beauregard stated in his affidavit that the Company maintains all of its records pertaining to the Plan at its Florida headquarters and that the plaintiff's request for production of documents would require the production of several thousand pages of documents. Clearly, with all the Company's records in Florida, and the issues in this case relating to the Plan and ownership of the Company's stock, a large quantity of documents may be at issue that are most easily accessed in Florida. Therefore, this factor weighs in favor of transferring the case to Florida.

### D. Local Interest in Deciding Local Conflicts at Home and the Unfairness in Burdening Citizens in an Unrelated Forum with Jury Duty.

The present controversy has more connection with the State of Florida than with Rhode Island. That is not to say that the case does not have some connection with the State of Rhode Island, but that connection is now tenuous at best. Plaintiff is not a Rhode Island resident and the Company is not a Rhode Island corporation. It is true that some of Company's products are sold in Rhode Island, but this action has no relation to those products. This case relates specifically to the ownership of the Company and benefits allegedly withheld from an out of state plaintiff. While both parties had a contact to Rhode Island at one time, these prior contacts do not create any intrinsic connection between the state and the present controversy. On the other hand, because the Company is a corporation based in Florida and because the ownership and actions of the Company are at issue in this case, the State of Florida has a greater interest in the present dispute. Plaintiff in fact has demanded that this case be tried before a jury. (Complaint at 5.) Therefore, Florida's local interest in this suit and the concomitant fairness in having its citizens sit on a jury to decide it, favor transfer of this suit to Florida.

### E. The Interest in Having the Trial of a Diversity Case in a Forum at Home with the Governing Law and the Avoidance of Problems in Conflicts of Law.

These factors have little effect on the § 1404(a) analysis in this case. Choice of

law issues can be important factors but are not entitled to great weight when the applicable law is settled or clear. *SW Industries, Inc. v. Aetna Casualty and Surety Co.,* 653 F.Supp. at 638–9; *Pennwalt Corp. v. Purex Industries, Inc.,* 659 F.Supp. at 292. The parties agree that the Settlement Agreement is governed by Delaware law but dispute whether the plan is controlled by Rhode Island or Delaware law. Nevertheless, plaintiff's complaint makes relatively straightforward breach of contract and misrepresentation claims. Such issues are clear-cut and neither this court nor the federal court in Florida should run into any difficulties in interpreting the applicable law on these issues. Thus, the choice of law issues in this case do not weigh for or against transfer.

F. Remaining Factors.

The remaining factors have no impact on this analysis. While plaintiff represented at oral argument that the average period of time from filing of an action to trial in the United States District Court for the Southern District of Florida was 17 months in comparison to 13 months in this District, that discrepancy is too small to favor or prevent transfer of this case. Also, no view of any premises is necessary in this case. Therefore, that factor is inapplicable.

*Conclusion*

As noted above, consideration of the convenience of the parties and witnesses along with the location of the documentary evidence in this case and various public interests favors transfer of this case to Florida. Therefore, based on the foregoing analysis, I recommend that the defendant's motion to transfer this case to the United States District Court for the Southern District of Florida be granted. By separate order, the defendant's motion to stay discovery is denied as moot and disposition of the plaintiff's motion to compel is passed, reserving such determination for the United States District Court for the Southern District of Florida, as

that court should control discovery matters in the cases on its docket.

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt.[1] Failure to file specific objections in a timely manner constitutes a waiver of the right to review by the district court.[2]

November 1, 1994.

---

1. Rule 32, Local Rules of Court,; F.R.Civ.P. 72(b).

2. *United States v. Valencia–Copete,* 792 F.2d 4 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1st Cir.1980).