**BROOKFIELD MACHINE,
INC., Plaintiff,**

**v.**

**CALBRIT DESIGN, Defendant.**

**Civil Action No. 95–40116–NMG.**

United States District Court,
D. Massachusetts.

June 12, 1996.

motion.

Lawrence Delaney, Mountain, Dearborn & Whiting, Worcester, MA, for Brookfield Machine, Inc.

Robert D. Hillman, John Foskett, Deutsch, Williams, Brooks, DeRensis, Holland & Drachman, Boston, MA, Joel T. Kornfeld, Ward, Kroll & Jampol, Beverly Hills, CA, for Calbrit Design.

## MEMORANDUM AND ORDER

GORTON, District Judge.

On June 22, 1995, the plaintiff in the above-entitled matter, Brookfield Machine, Inc. ("Brookfield") filed a three-count Complaint alleging various state law claims against the defendant, Calbrit Design ("Calbrit"). Count I seeks a declaratory judgment that Calbrit breached a contract between the parties and that "any amounts that Brookfield would otherwise owe to Calbrit under the contract are exceeded by the damages that Calbrit's breaches caused Brookfield." Complaint ¶ 27. Count II alleges breach of contract by Calbrit, and Count III asserts a claim pursuant to M.G.L.c 93A. This Court's subject matter jurisdiction is premised upon the parties' diversity of citizenship. *See* 28 U.S.C. § 1332(a)(1).

On September 1, 1995, Calbrit filed, pursuant to Fed.R.Civ.P. 12(b)(2), a motion to dismiss for lack of personal jurisdiction or, in the alternative, to transfer the action to the Southern District of California. Plaintiff opposes the motion. On October 2, 1995, Calbrit filed a motion to strike certain statements from an affidavit submitted by Brookfield's president in opposition to the motion to dismiss. Brookfield opposes that motion also. For the reasons that follow, 1) the motion to strike will be allowed in part, and denied, in part, and 2) the motion to dismiss or, alternatively, to transfer, will be denied.

### I. *Legal Standard*

 When challenged by defendant, the plaintiff bears the burden of proving the existence of personal jurisdiction. *See Foster–Miller, Inc. v. Babcock & Wilcox Canada,* 46 F.3d 138, 145 (1st Cir.1995). In considering defendant's motion, this Court employs the *prima facie* standard, under which the Court considers whether the plaintiffs have proffered evidence that, "if credited, is enough to support findings of all facts essential to personal jurisdiction."

---

1. Brookfield contacted Calbrit because of the latter's expertise with "CATIA," a type of software Dow–UT required for use on the F–22 IF project.

2. In a September 2, 1994 cover letter accompanying Calbrit's quotation for the F–22 IF project, Mitchell told Brookfield president Christopher

---

*Boit v. Gar–Tec Products, Inc.,* 967 F.2d 671, 675 (1st Cir.1992). When determining whether a *prima facie* showing has been made, this Court does not act as a factfinder, but instead "accepts properly supported proffers of evidence by a plaintiff as true." *Boit,* 967 F.2d at 675.

### II. *Factual Background*

In ruling upon the motion to dismiss and applying the standard set forth above, this Court relies upon the following relevant facts:

Calbrit is an eight-person corporation with a principal place of business in Carlsbad, California. Calbrit uses computer software to design tools that are, in turn, used to fabricate parts for the aerospace industry. Calbrit has no place of business or employees in Massachusetts and is not licensed to do business in Massachusetts. Calbrit neither owns property nor advertises in Massachusetts. With the exception of its contract with Brookfield, Calbrit has not contracted with any other Massachusetts entity.

In August, 1994, Brookfield was contacted by Dow–United Technologies Composite Products, Inc. ("Dow–UT"), a Delaware Corporation with a principal place of business in Connecticut which serves as a subcontractor on the prime contract between Lockheed and the Air Force for the construction of the F–22 aircraft. Dow–UT requested that Brookfield provide it with quotations for several contracts in connection with the F–22 project, including one for the design and fabrication of an F–22 Internal Frame tooling package ("the F–22 IF project"). Brookfield forwarded those requests and statements of work to Calbrit's president, Robert Mitchell ("Mitchell") in California.[1] Calbrit provided Brookfield with quotes on several contracts which were incorporated by Brookfield into at least three bids submitted to Dow–UT.[2] *See* Nesbitt Aff. at ¶¶ 10–12.

---

Nesbitt ("Nesbitt") that "[he] believe[d] that [the companies'] teaming arrangement makes [them] a very strong contender to be awarded one of the[] DOW packages." Nesbitt Aff. at ¶ 12 & Exhibit C. The parties agreed that Calbrit's designs would be produced at its California facility

In September, 1994, Dow–UT informed Brookfield that it was a finalist on the F–22 IF subcontract and invited both Brookfield and Calbrit to its Connecticut offices to discuss the project. In preparation for the meeting, Mitchell and Nesbitt spent "considerable time ... revising schedules and discussing strategy," by means of frequent phone calls and facsimile transmissions. Nesbitt Aff. at ¶ 14. In order to strengthen the bid, Mitchell and Nesbitt "agreed that Calbrit would make a CATIA computer workstation and at least one engineer available at Brookfield's [ ] Massachusetts facility for the duration of the F–22 IF project." *Id.* at ¶ 15.

In further preparation for the meeting with Dow–UT, Brookfield prepared additional materials describing the working relationship that Calbrit and Brookfield intended to maintain for the project's duration. *Id.* at ¶ 16. Included in those materials, which Calbrit personnel reviewed prior to the meeting, was the following statement:

> Together, Brookfield and Calbrit have formed a unique partnership. When we are awarded the purchase order for this program, Calbrit will assign and transfer the appropriate number of engineers to Brookfield's location in Massachusetts. In addition, RISC 6000 workstations will be installed in Brookfield. This plan will be implemented and fully operational within one week of receipt of the purchase order.

*Id.* at ¶ 16, Exhibit D.

Brookfield and Calbrit each sent a representative to the Connecticut conference, which lasted five hours. At the meeting, Mitchell and Nesbitt "jointly represented to Dow–UT that within a week of the program's inception, Calbrit would install a CATIA workstation and an engineer at Brookfield's facility and that this capability would exist for the duration of the project." Nesbitt Aff. at ¶ 19. The Dow–UT representatives were adamant that a condition of the contract

would be the existence of a CATIA workstation at Brookfield. At the meeting, Mitchell and Nesbitt "indicated that Brookfield and Calbrit wanted to be among [a] core [group of] subcontractors that would form a long-term relationship with Dow–UT." *Id.* at ¶ 21.

After the meeting, Nesbitt drove Mitchell to Brookfield's Massachusetts facility where he 1) gave Mitchell a tour of the plant, 2) pointed out space where the CATIA workstation could be located, and 3) pointed out places where Calbrit personnel could be housed during the project. *Id.* at ¶ 22. In his affidavit, Nesbitt further states that he and Mitchell discussed the possibility that their companies could win between four and six of the Dow–UT contracts, "which would provide both [ ] companies with a steady flow of work for the next three years." *Id.* at ¶ 23.

In October, 1994, Dow–UT awarded the F–22 IF subcontract to Brookfield, which, in turn, sent a purchase order to Calbrit in the amount of $128,000. The purchase orders identified a series of tools and the dates on which the designs for those tools would be due, and specified that the last group of designs would be due in two months, on December 19, 1994.

According to Nesbitt's affidavit, problems arose soon after Calbrit began work on the F–22 IF project because Calbrit failed to make a CATIA workstation available at Brookfield within one week of the contract's inception, as both companies had promised Dow–UT. Nesbitt Aff. at ¶ 27. "Dow–UT complained to Brookfield of [that] omission and also questioned the resources that Calbrit was devoting to the F–22 IF project because designs were not being generated as scheduled." *Id.* It was necessary for Brookfield to lease, and ultimately to purchase, a CATIA workstation because of the alleged failure. *Id.* at ¶ 33.[3]

and then transmitted to Brookfield in the form of digitized computer files. Mitchell Aff. at ¶ 5. Calbrit's quotation projected that its design work would take place over a period of two months. *Id.*

**3.** Not surprisingly, Calbrit disputes Brookfield's recitation of events in several respects. Bearing in mind the procedural posture of the case, however, and that, when determining whether a *prima facie* showing has been made, this Court is not to act as a factfinder, but instead "accept[ ] properly supported proffers of evidence by a

On November 23, 1994, Nesbitt received a faxed letter from Mitchell in which Mitchell, contrary to the terms of the purchase order, sought partial payment for Calbrit's work on the project. Nesbitt Aff. at ¶ 29, Exhibit F. The letter also indicated that Calbrit was not willing to provide the CATIA workstation and engineer at Brookfield. *Id.* According to Nesbitt's affidavit, Mitchell threatened to cease work on the F–22 IF project unless Calbrit received at least partial prepayment. *Id.* at ¶ 32. Because Brookfield "could not at that point complete the [ ] contract without Calbrit," it drew a $40,000 check from its Worcester bank account as an "advance" to Calbrit. *Id.*

During the course of the project, three Calbrit employees visited the Brookfield facility in Massachusetts. Olga Rios, a Calbrit engineer, performed services at Brookfield on November 8 and 9, 1995 and assisted in the installation of a CATIA workstation at Brookfield. Nesbitt Aff. at ¶ 34. Tim Dwerryhouse, a second Calbrit engineer, spent ten days at Brookfield in January, 1995. *Id.* at ¶ 35. In his affidavit, Nesbitt states that despite Calbrit's earlier promise to make technical personnel available in Massachusetts, "Mitchell insisted that Brookfield assume all transportation and lodging costs for Mr. Dwerryhouse and issue a purchase order treating his programming services as additional contract costs." *Id.* at ¶ 35.

By letter dated January 25, 1995, Mitchell wrote to Nesbitt that Calbrit had spent 122 hours of programming time at Brookfield's Massachusetts facility. *Id.* at ¶ 36, Exhibit H.[4] During the course of Calbrit's work on the F–22 IF project, a large volume of telephone calls, fax transmissions and overnight deliveries between the companies occurred. During the period from September, 1994 to May, 1995, at least 332 phone calls were placed from Brookfield to Calbrit; Nesbitt estimates that the volume of calls from Calbrit to Brookfield equaled or exceeded that number. Nesbitt Aff. at ¶ 40.

Brookfield further asserts that, in addition to Calbrit's failure to meet scheduled dates, it also submitted tool designs which were "replete with errors and which required frequent communications to remedy." Nesbitt Aff. at ¶ 38. Calbrit's work in the F–22 IF project was substantially completed by the end of March, 1995. Brookfield was charged $178,540 by Calbrit for its design work on the project, and $138,540 of that amount remains unpaid. Mitchell Aff. at ¶ 15.

## III. *Discussion*

### A. *Calbrit's Motion to Strike*

Calbrit has filed a motion to strike certain statements made by Brookfield president Christopher Nesbitt in his affidavit filed in connection with Brookfield's Opposition to the motion to dismiss. Specifically, Calbrit objects to six statements in Nesbitt's affidavit.

#### 1. *Paragraph 21*

Paragraph 21 of Nesbitt's affidavit states that:

> Dow–UT employees also stated that the F–22 IF project was among the first of approximately 20 scheduled projects related to Dow–UT's work on the F–22 aircraft and that it was their intent that all that work be divided among 3 or 4 reliable groups of subcontractors. Mr. Mitchell and I indicated that Brookfield and Calbrit wanted to be among those core subcontractors that would form a long term relationship with Dow–UT.

Calbrit objects to the first sentence of Paragraph 21 as hearsay. Brookfield counters that the statement is not being offered for its truth, but rather "for the effect that the prospect of additional contracts had on the relationship between Calbrit and Brookfield." Plaintiff's Opposition at 2. This Court finds Brookfield's response unpersuasive, and Calbrit's motion to strike the first sentence of Paragraph 21 will, therefore, be allowed.

---

plaintiff as true," *Boit,* 967 F.2d at 675, this Court credits Nesbitt's version of events for purposes of the motion to dismiss.

4. In mid-February, 1995, a third Calbrit employee, Jeff Lalonde, spent "several days at Brookfield working on tool designs and correcting previous Calbrit errors." Nesbitt Aff. at ¶ 37.

## 2. *Paragraph 28*

■ Paragraph 28 of Nesbitt's affidavit states:

> In early November, 1994, I spoke with Mr. Mitchell and he told me that seven engineers were working seven days a week for Calbrit on the F–22 IF project and I relayed that information to Dow–UT. I later learned that this representation was incorrect.

Calbrit objects to the second sentence on the ground that "it lacks foundation because the witness has no personal knowledge of the subject matter of the statement." Motion at 1. Brookfield responds that the objection is meritless because Mitchell "has submitted an affidavit which states that 'Calbrit had six engineers on the project' and contradicts his earlier statement." Opposition at 2–3. This Court agrees with Brookfield and the motion to strike the second sentence of Paragraph 28 will, therefore, be denied.

## 3. *Paragraph 31*

■ Calbrit seeks to strike paragraph 31 in its entirety. That paragraph details a dispute between Brookfield and Calbrit with respect to whether Calbrit is owned or controlled by a larger company named Certified Fabricators, Inc. ("CFI"). Inasmuch as that issue played no role on this Court's personal jurisdictional analysis, see part B, *infra*, the motion to strike that paragraph will be denied as moot.

## 4. *Paragraph 34*

■ In Paragraph 34 of his affidavit, Nesbitt states that a Calbrit engineer "performed services at Brookfield on November 8, and I believe, November 9, 1995. She also assisted in the installation of a CATIA workstation at Brookfield in November, 1994." Calbrit objects to the phrase "and I believe, November 9, 1995" on the ground that the witness lacks personal knowledge of the subject of the statement. This Court agrees with Brookfield that the reference to the wrong year is "an obvious typographical error that should have read '1994'." Opposition at 4. Furthermore, the statement made on personal belief is admissible for these purposes and the motion to strike Paragraph 34 will thus be denied.

## 5. *Paragraph 40*

■ In Paragraph 40 of his affidavit, Nesbitt summarizes in a single chart telephone bills that extend over more than one year. Calbrit objects on the basis that the original records were not attached pursuant to Fed. R.Evid. 1002.

Brookfield responds that Fed.R.Evid. 1006 permits summaries of voluminous records when originals are available. Moreover, in a Supplemental Affidavit, Nesbitt attaches as Exhibit D copies of Brookfield's phone records that formed the basis of the chart. For those reasons, the motion to strike Paragraph 40 will be denied.

## 6. *Paragraph 43(b)*

■ Calbrit's final objection is to a portion of paragraph 43, which again involves the issue of whether CFI owns or controls Calbrit. Paragraph 43(b) states that:

> Mitchell's affidavit at paragraph 17(b) identifies Mark Pucci and Roger Blanchard as Calbrit employees. These individuals were introduced to me as employees of CFI, Calbrit's parent, which acquired an interest in Calbrit at some point after my initial discussions with Mr. Mitchell. I believe that among the reasons that Calbrit was unable to meet its obligations on the F–22 IF project was that it was performing design services for other customers at the direction of its new owner, CFI.

Calbrit objects to the entire paragraph on the grounds that: 1) the witness has no personal knowledge of the subject matter, and 2) the statement is inadmissible hearsay.

As an initial matter, it should be noted that the first two sentences of Paragraph 43(b) played no role in this Court's resolution of the jurisdictional issue and the motion to strike those two sentences will, consequently, be denied as moot. The last sentence of Paragraph 43(b) will, however, be stricken on the basis of lack of a foundation or personal knowledge.

## B. *Calbrit's Motion to Dismiss for Lack of Personal Jurisdiction*

■ Ordinarily, a federal court exercising diversity jurisdiction must find sufficient contacts between the defendant and the forum state to satisfy both that state's long-arm statute and the Fourteenth Amendment Due Process clause. *Ticketmaster–New York, Inc. v. Alioto*, 26 F.3d 201, 204 (1st Cir.1994). In the case at bar, however, Calbrit's motion to dismiss "does not challenge the applicability of the long-arm statute," Reply Brief at 5, n. 3, but rather maintains that the exercise of jurisdiction does not comport with due process. Accordingly this Court will bypass the statutory phase of the jurisdictional analysis and proceed directly to the constitutional inquiry.

■ The Due Process Clause of the United States Constitution requires that there be sufficient minimum contacts between a defendant and the forum such that the exercise of personal jurisdiction over a defendant comports with "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). The First Circuit employs a three-part analysis to determine if sufficient contacts exist to exercise specific personal jurisdiction:

1. The claim underlying the litigation must directly arise out of, or relate to, the defendant's in-forum activities;

2. The defendant's in-state contacts must represent a purposeful availment of the privileges of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable; and

3. the exercise of jurisdiction must, in light of certain "gestalt" factors, be reasonable.

*United Elec. Workers v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1089 (1st Cir.1992).[5] These factors are considered *seriatim*.

### 1. *Relatedness*

■ In *Sawtelle v. Farrell*, the First Circuit Court of Appeals described the relatedness requirement as follows:

> Although this requirement is "the least developed prong of the due process inquiry," it serves the important function of focusing the court's attention on the nexus between a plaintiff's claim and the defendant's contacts with the forum. Relatively speaking, the relatedness test is a "flexible, relaxed standard," as suggested by the disjunctive nature of the requirement.

70 F.3d 1381, 1389 (1st Cir.1995) (internal citations omitted). The relatedness requirement is not met merely because a plaintiff's cause of action arose out of the general relationship between the parties; rather, "the action must directly arise out of the specific contacts between the defendant and the forum state." *Id.; United Elec. Workers*, 960 F.2d at 1089.

In the case at bar, Calbrit argues that its Massachusetts based conduct is "not at all" a basis for Brookfield's claims. Defendant's Memorandum at 14. Insisting that the gravamen of Brookfield's Complaint is that Calbrit did not complete its design work in a timely manner, Calbrit asserts that the work about which plaintiff complains was performed entirely in San Diego, not Massachusetts, and hence "there is no relationship between Calbrit's minimal forum-based conduct and the claims Brookfield asserts." *Id.* This Court disagrees.

Calbrit is correct in its assessment that one aspect of plaintiff's breach of contract claim involves defendant's *failure* to establish a Massachusetts contact (i.e., the CATIA workstation at Brookfield's facility). Plaintiff's breach of contract claim also asserts, however, that Calbrit failed to meet schedules and sent into Massachusetts designs

---

5. In analyzing minimum contacts, courts have recognized two kinds of personal jurisdiction: "general" and "specific." *See, e.g., Donatelli v. National Hockey League*, 893 F.2d 459, 462–63 (1st Cir.1990) (detailing differences). In the case at bar, Brookfield concedes that general jurisdiction over Calbrit does not exist, *see* Plaintiff's Opposition at 6, n. 3, and hence this Court need consider only the issue of specific jurisdiction (i.e., jurisdiction which a state may assert when a claim arises directly out of forum-based activities). *Donatelli*, 893 F.2d at 462.

containing defects and errors. Complaint at ¶¶ 17–23, 28–31. Moreover, Nesbitt's affidavit states that a Calbrit employee spent several days at Brookfield in February, 1995, in an attempt to "work[ ] on tool designs and [to] correct[ ] previous Calbrit errors." Nesbitt Aff. at ¶ 37. Those factors, when considered in conjunction with the numerous telephone calls, mailings and facsimile transmissions directed by Calbrit into Massachusetts—all of which involved the subject matter forming the basis of Brookfield's breach of contract claim—lead this Court to conclude that Calbrit's in-state conduct forms an important element of proof in Brookfield's cause of action. *See United Elec. Workers,* 960 F.2d at 1089.

### 2. *Purposeful Availment*

■ The second consideration is whether defendant's contacts with Massachusetts represent a "purposeful availment" by defendant of the privilege of conducting activities in that State. The concept of purposeful availment rests upon the twin cornerstones of voluntariness and foreseeability, *Sawtelle,* 70 F.3d at 1391, and serves to assure that personal jurisdiction is not premised solely upon a defendant's "random, isolated, or fortuitous" contacts with the forum. *See Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984).

■ The standard of purposeful availment is not rigorous, "casts a wide net," *Pritzker v. Yari,* 42 F.3d 53, 62 (1st Cir. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1959, 131 L.Ed.2d 851 (1995), and may be fulfilled by a single act. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 n. 18, 105 S.Ct. 2174, 2184 n. 18, 85 L.Ed.2d 528 (1985). At bottom, the question the Court must consider is:

> whether the commercial action taken, in light of the contacts with the forum state it entailed, amounts to a purposeful decision by the nonresident to "participate" in the local economy and to avail itself of the benefits and protections of the forum.

*Bond Leather Co. v. Q.T. Shoe Mfg. Co.,* 764 F.2d 928, 933–34 (1st Cir.1985).

In the case at bar, Calbrit argues that the requisite purposeful availment is lacking because: 1) Brookfield solicited Calbrit, 2) Calbrit entered into a simple contract with a projected duration of merely two months, and 3) Calbrit designed the tools specified in the purchase orders at its California facility.

As a threshold matter, the fact that Brookfield initiated the relationship with Calbrit is not decisive on the issue of purposeful availment. *See Pedi Bares, Inc. v. P & C Food Markets, Inc.,* 567 F.2d 933, 937 (10th Cir. 1977); *Carlson Corp. v. University of Vermont,* 380 Mass. 102, 109 n. 11, 402 N.E.2d 483 (1980) ("The fact that the resident plaintiff may have initiated the ... business relationship is not a fact which is entitled to constitutional consideration"). In addition, Nesbitt's affidavit provides ample evidence that Calbrit intentionally developed an ongoing relationship with a Massachusetts corporation such that defendant voluntarily and purposefully availed itself of the benefits of conducting business activities in Massachusetts, rendering foreseeable the possibility of being held accountable in a Massachusetts court.

Both parties envisioned a relationship based upon F–22 contracts that would last for several years, and Nesbitt and Mitchell discussed the possibility that their corporations could jointly win four to six such contracts. *See* Nesbitt Aff. at ¶ 23. Moreover, Calbrit agreed to supply a computer workstation and an engineer in Massachusetts for the duration of the F–22 IF project, and three Calbrit employees performed at least 122 hours of services in Massachusetts in connection with that project. *See* Nesbitt Aff., Exhibit H. When one considers, in addition to the foregoing factors, the veritable flood of communications between the defendant and the plaintiff in Massachusetts, this Court concludes that Brookfield has demonstrated the requisite purposeful availment by Calbrit in Massachusetts.

### 3. *The Gestalt Factors*

■ As noted in *Sawtelle,* the "reasonableness" stage of the personal jurisdiction inquiry is reached only if the first two segments of the test for specific jurisdiction

have been fulfilled. *Id.* at 1394; *see also United Elec. Workers,* 960 F.2d at 1091 n. 11. In *Ticketmaster,* the Court of Appeals observed that the "reasonableness" stage of the inquiry evokes a sliding scale:

> the weaker the plaintiff's showings on the first two prongs (relatedness and purposeful availment), the less a defendant need show in terms of unreasonableness in order to defeat jurisdiction. The reverse is equally true: an especially strong showing of reasonableness may serve to fortify a borderline showing of relatedness and purposeful availment.

26 F.3d at 210.

■ The factors to consider at this stage include: 1) the defendant's burden of appearing, 2) the forum state's interest in adjudicating the dispute, 3) plaintiffs' interest in obtaining convenient relief, 4) the judicial system's interest in obtaining the most effective resolution of the controversy; and 5) the common interests of all sovereigns in promoting substantive social policies. *See United Elec. Workers,* 960 F.2d at 1088. In the case at bar, the parties have addressed only the first three of these factors; the final two factors are neutral and add little to the analysis.

### a) *The defendant's burden of appearing*

■ In considering this first factor, it should be noted that the "ordinary cost and inconvenience of litigating in another forum is insufficient to render [this] factor meaningful." *Nowak v. Tak How Investment Ltd.,* 899 F.Supp. 25, 33 (D.Mass.1995). Instead, this factor assumes constitutional significance only where a party can demonstrate a "special or unusual" burden. *Pritzker,* 42 F.3d at 64.

In the case at bar, Calbrit argues that if the instant case is tried in Massachusetts and six of its eight employees must travel to Massachusetts, it will effectively have to shut down during the time that the employees' presence here is required. In response, Brookfield maintains that Calbrit's burden is neither special nor unusual, and that the burden is "essentially no different than [that which] would be imposed on Brookfield" if the case were litigated in California. This

Court concludes that this factor tips slightly in Calbrit's favor, although the magnitude of the burden falls well short of assuming constitutional significance such that the exercise of jurisdiction contravenes the Due Process clause.

### b) *The forum state's adjudicatory interest*

Brookfield argues that Massachusetts "has a direct interest in protecting one of its own [corporations] from any potential wrongdoing on the part of an out-of-state business." *Rhode Island Hospital Trust Nat'l Bank v. San Gabriel Hydroelectric Partnership,* 667 F.Supp. 66, 72 (D.R.I.1987). Calbrit counters by asserting that "presumably, California's interests are equally as strong as Massachusetts' interests." Reply Brief at 9.

This Court finds Calbrit's argument unavailing. In *Foster–Miller, Inc. v. Babcock & Wilcox Canada,* 46 F.3d 138, 151 (1st Cir. 1995), the Court of Appeals observed that the purpose of this consideration is not to *compare* the interest of the forum state to that of another jurisdiction; rather, the factor considers the extent to which the forum state *has* an interest. This factor thus cuts in favor of jurisdiction in Massachusetts.

### c) *The plaintiff's interest in obtaining convenient relief*

It is a well-established proposition that a plaintiff's choice of forum is to be accorded a degree of deference with respect to the issue of its own convenience. *E.g., Pritzker,* 42 F.3d at 64; *Ticketmaster,* 26 F.3d at 211. Unquestionably, it would be more convenient for Brookfield to litigate its claim in Massachusetts.

### 4. *Conclusion*

In sum, this Court concludes that Brookfield has successfully carried its burdens at the first two stages of the jurisdictional analysis. Proceeding to the third stage, this Court notes that, although in some cases "unreasonableness can trump a minimally sufficient showing of relatedness and purposefulness," see *Ticketmaster,* 26 F.3d at 210, Brookfield's demonstration of relatedness and purposeful availment was both solid

and convincing. Indeed, although the defendant's burden of appearing is not insignificant, this Court concludes that, in view of the totality of the circumstances, that burden is not "so onerous that it renders the exercise of [personal] jurisdiction unreasonable." *Id.* at 212. This Court concludes, therefore, that the exercise of personal jurisdiction over Calbrit would comport with Due Process and defendant's motion to dismiss will, therefore, be denied.

### C. *Calbrit's Motion to Transfer*

In the alternative, Calbrit seeks transfer of the instant action to the Southern District of California. A district court may, "[f]or the convenience of parties and witnesses, in the interest of justice, ... transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a).

The decision to transfer a case pursuant to § 1404 rests within the sound discretion of the trial court. *See Codex Corp. v. Milgo Electronic Corp.*, 553 F.2d 735, 737 (1st Cir.1977). A presumption in favor of the plaintiff's choice of forum exists, and the burden of proving that a transfer is warranted rests with the defendant. *Princess House, Inc. v. Lindsey*, 136 F.R.D. 16, 18 (D.Mass.1991); *McEvily v. Sunbeam–Oster Co., Inc.*, 878 F.Supp. 337, 344 (D.R.I.1994). In making its determination, the Court must balance several factors, while bearing in mind the fact that plaintiff's choice of forum is entitled to "great weight." *Home Owners Funding Corp. of America v. Century Bank*, 695 F.Supp. 1343, 1347 (D.Mass.1988); *Lindsey*, 136 F.R.D. at 18. Other factors to consider include the convenience of the parties and witnesses, the availability of documents and the interests of justice. *Home Owners Funding Corp.*, 695 F.Supp. at 1347; *Lindsey*, 136 F.R.D. at 18. Of those factors, the convenience to the expected witnesses is "probably the most important factor, and the factor most frequently mentioned." *Lindsey*, 136 F.R.D. at 18.

Calbrit asserts that the convenience of the witnesses and the interests of justice both weigh heavily in favor of a transfer to the Southern District of California. Specifically, Calbrit argues that the testimony of six Calbrit employees, all of whom reside and work in California, is relevant and material to the lawsuit. Brookfield responds by pointing to an equal, if not greater, number of witnesses who would be inconvenienced if the case were transferred to California. In addition to numerous current and former Brookfield employees who would likely be called to testify at trial, plaintiff notes that four key non-party witnesses (i.e., employees of Dow–UT, all of whom were present at the September 29, 1994 meeting when Calbrit's president allegedly promised to make a computer workstation and engineer available in Massachusetts) are based in Connecticut, and hence transfer to California would make the case even more burdensome.

This Court concludes that Calbrit has failed to carry its burden of showing that the proposed transfer to the Southern District of California is warranted. Although it is difficult for the Court, at this early stage in the litigation, to determine with certainty who the key witnesses will be, they do not appear to be centered in the Southern District of California. *Cf. Home Owners Funding Corp.*, 695 F.Supp. at 1348. Accordingly, defendant's motion to transfer will be denied.

### ORDER

For the foregoing reasons:

1) with respect to defendant's motion to strike portions of the Nesbitt affidavit, the following rulings are made:

a) the first sentence of Paragraph 21 is stricken,

b) the last sentence of Paragraph 43(b) is stricken, and

c) the motion is otherwise **DENIED.**

2) defendant's motion to dismiss for lack of personal jurisdiction is **DENIED;** and

3) defendant's motion to transfer to the Southern District of California is **DENIED.**

So ordered.